STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ANDREW MOSLEY, PLAINTIFF IN ERROR.

Argued May 19, 1925—Decided December 18, 1925.

1. Testimony considered and *held* that the verdict of murder in the first degree is not against the weight of the evidence.
2. Under the ample review permitted by the Criminal Procedure act (2 *Comp. Stat., p.* 1863, § 136) the admission or exclusion of testimony is available as ground of error, without the ruling of the trial judge with relation thereto being made the subject of exception or objection.
3. The trial court, in its discretion, may permit counsel to make use of objects in illustrating his argument to the jury.
4. As the jury found the defendant guilty of murder in the first degree, and there was sufficient evidence to support that finding, and which was not against the weight of the evidence, the defendant is not harmed by an erroneous definition with reference to murder in the second degree, assuming that there was error in that respect.

5. An instruction to the jury that one of the elements to be con-
sidered in determining the defendant's punishment, if they
should find him guilty of murder in the first degree, is that if
they should by their verdict impose life imprisonment, it can
be disregarded and set at naught by the court of pardons, and,
also, that every convicted prisoner confined in the state prison
for life, whose record of conduct shows that he has observed
the rules of the institution, and who has served not less than
fifteen years, may be released on parole, is not erroneous.

On error to the Essex Oyer and Terminer.

For the plaintiff in error, *William V. Azzoli.*

For the defendant in error, *John O. Bigelow,* prosecutor
of the pleas.

The opinion of the court was delivered by

WALKER, CHANCELLOR.   Andrew Mosley, the plaintiff in
error, was convicted of murder in the first degree, in the
Essex Oyer and Terminer, without recommendation, for the
killing of Edward Tucker, and sentenced to be executed.
He sued out a writ of error to this court under section 136
of the Criminal Procedure act. *2 Comp. Stat., p.* 1863.

The homicide took place on January 10th, 1922, in a
pool room in Newark operated by the deceased. The room
was divided by a partition not extending its whole length,
and not extending to the ceiling. There were present in the
rooms, front and back—if they may be called rooms—Henry
Williams, William Fleming, James Sully, William Smith,
John N. Jones and Willy Fleming. Their testimony, al-
though differing slightly as to the words used (one witness
(Sully) saying he heard Mosley and Tucker arguing, but
could not tell exactly what words they used), was that Mos-
ley asked Tucker for money, to which the latter replied that
he did not owe him anything and did not have anything,
whereupon Mosley said with an oath that he would have
to get it and Tucker made a vulgar and impossible retort,
whereupon Mosley drew a revolver. Tucker threw up his
hands, and Mosley shot; Tucker fell to the floor and shortly

thereafter died; Mosley went out of the place, fled the state, lived at various places under an assumed name, and was arrested in Pottsville, Pennsylvania, more than three years after the homicide. Lee Edwards, a witness, testified that in another pool room on the morning of January 10th, 1922, Mosley, whom he knew, appeared, and in a conversation with a man standing near, whom witness did not know, said he was going to kill Tucker when he saw him. Mosley was the only witness sworn on his direct defense. He testified that he had just played a game of pool with someone in the Tucker pool room, and the latter came in and asked to see the gun he had to sell, and then he walked into the front room where he had left his coat, to take it out of the pocket, and in doing so the gun went off accidentally; he denied that he had had any altercation with Tucker about money or otherwise, never said in the presence of anyone that he was going to kill Tucker, and did not remember seeing him throw up his hands; that there was no feeling between them that he knew of; they always got along well together. Several witnesses were called in rebuttal for the state, but gave unimportant evidence, and this was so as to other testimony given for the defendant in rebuttal.

Counsel for Mosley says in his brief:

"The facts in this case lead irresistably to the conclusion that the defendant, Mosley, pulled out his gun in the heat of passion intending to do grave bodily harm to the deceased, Tucker, without justification and lacking the other elements of the highest degree, viz., premeditation, deliberation and willfulness."

It may be assumed, therefore, that the defense has been shifted from accidental killing to murder committed in the heat of passion, without justification and with intent to do great bodily harm, but without premeditation, deliberation and willfulness—in other words, to murder of the second degree. But this shifting of the defense has no controlling effect upon the questions before the court, and, therefore, is quite immaterial.

The first contention on behalf of the defendant is that the verdict is against the weight of the evidence. Clearly,

it is not, but, on the contrary, is entirely justified by the evidence as the above recital of the testimony demonstrates. To justify a court in setting aside a verdict in a criminal case, under *Pamph. L.* 1921, *p.* 951, on the ground that it is against the weight of the evidence, the verdict must so clearly appear that it is against the weight of the evidence as to give rise to the inference that it is the result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546. And, surely, this verdict is not in that category. This contention must be overruled.

It is argued for Mosley that there was error concerning the admission and rejection of certain testimony of sundry witnesses, but, as to the court's ruling on such of it as was excepted or objected to, no manifest wrong or injury resulted to the defendant, and as to the rest there was no exception or objection, and, therefore, nothing to review.

Now, the object of an exception is to challenge the correctness of the ruling or decision of the trial court promptly, when made, to the end that such ruling or decision may be corrected by the court itself, if deemed erroneous, and to lay a foundation for review, if necessary, by the appropriate appellate tribunal. It is the general rule of law that rulings or decisions which affect substantial rights, and on which error is predicated, will not be revised unless an appropriate exception to the alleged error was reserved. 3 *C. J.* 894, 895. An error which occurs at the trial of a cause cannot be made a ground of reversal unless it is embraced in the bill of exceptions. *Potts* v. *Evans,* 58 *N. J. L.* 384; *Sherwin* v. *Sternberg,* 77 *Id.* 117, 118. These are authorities in civil causes, but the rules of law are generally alike in civil and criminal cases. *State* v. *Murphy,* 87 *Id.* 515. And in respect to the admission or rejection of evidence and exception thereupon, they are alike except as modified by statute or rule of court. While the Practice act of 1912 (*Pamph. L.. p.* 382) abolished bills of exceptions in civil cases, it did not abrogate the general rule that no decision relating to the reception or rejection of evidence will be reviewed unless the record discloses that an objection to such ruling was duly made or such ruling otherwise challenged at the

time it was made. *Kargman* v. *Carlo,* 85 *N. J. L.* 632. But,
in criminal cases, the old rule of requiring exceptions prevails, except on review of a conviction under Criminal Procedure act (2 *Comp. Stat., p.* 1863, § 136), provided the plaintiff in error shall specify the causes in the record relied upon for relief or reversal under section 137 (*supra, p.* 1866), having brought up the entire record of the proceedings had upon the trial with the bill of exceptions under section 136, which provides that on review of the entire record of the proceedings had upon the trial, if it appear that the plaintiff in error suffered manifest wrong or injury, either in the admission or rejection of testimony, whether objection was made thereto or not, the appellate court shall remedy such wrong or injury and give judgment accordingly. This was construed in *State* v. *Hummer,* 81 *N. J. L.* 430, to mean that the phrase "admission or rejection of testimony" imports judicial action—that is, that the action of the court in admitting or rejecting testimony may be reviewed without objection being made to such ruling. As is well said in the opinion of Mr. Justice Garrison, speaking for this court in the case (at *p.* 432) : "No one but the trial court can reject the testimony, hence as 'rejection of testimony' must imply action by the court; the same sort of meaning is by the familiar rule to be given to the word 'admission' as an associated term of precisely the same nature used in exactly the same context." So, the words "admission or rejection of testimony" mean the ruling of the court thereupon, either admitting or rejecting it, which ruling the defendant is entitled to review without excepting or rejecting to the adverse ruling.

There are three classes of cases relating to the admission or rejection of testimony under Criminal Procedure act, section 136, in only one of which defendant can have a review. The first is that class in which questions are asked and answered, with no objection made by the defense, and it is afterwards argued on writ of error that the questions were incompetent and the evidence illegal. In this class it is held that there will be no reversal even under the Criminal Procedure act, section 136, *supra,* because no judicial action is

involved. In *State* v. *Mohr,* 2 *N. J. Mis. R.* 261 (at *p.* 263);
127 *Atl. Rep.* 348, it was held by the Supreme Court that the
rule that a judgment may be reversed for an erroneous ad-
mission or rejection of evidence, where the ruling is not
objected to, applies only where judicial action has been taken
upon the question presented and the testimony has been
excluded or admitted over the objection thus taken; but
where the court takes no action upon the question there is
neither a judicial reception or rejection of the evidence.
Affirmed, 101 *N. J. L.* 230.

The second class is where the defendant permits testimony
to go in without objection to the question, but later moves
to strike it out. In this class it is held that the objection
made on the motion to strike comes too late. *State* v. *Dra-
gone,* 99 *N. J. L.* 144.

The third class is where testimony offered by the state
is admitted over objection by the defense, or where testi-
mony offered by the defense is excluded on the objection of
the prosecutor. In either event there is a ruling upon the
admission or rejection of the testimony, which is review-
able without exceptions or objection to such ruling, and, if
it works manifest wrong or injury to the defendant, it is
judicial error, which will lead to reversal. *Criminal Proce-
dure Act,* § 136, *supra;* see, also, *State* v. *Hummer, supra.*
This view requires consideration of testimony admitted or
rejected, coming within the purview of the statute under the
rule above laid down, so far as the subject was argued on
behalf of Mosley. A question in that category occurred on
the cross-examination of the state's witness Jones, who was
asked by counsel for Mosley: "*Q.* Were you not held by
Judge Stickel for perjury in a gun case in a pool parlor on
Orange street?" Objection by counsel for the state, not
stating any ground upon which it rested, was sustained; and
defendant's counsel unnecessarily prayed an exception, which
was allowed, signed and sealed accordingly.

A man held for court for perjury might not be indicted,
or, being indicted, might be acquitted. The interrogatory
was doubtless a preliminary one to be followed by a question
as to whether or not he had been convicted; for it is only

the latter that would affect his credit as a witness.    See *Evidence Act, Comp. Stat., p.* 2217, § 1.    And while the preliminary query may not be objectionable, nevertheless, the defendant was not manifestly wronged or injured by the sustaining of the objection to it, because if the discrediting evidence existed he could have effected his purpose by offering it.    If it did not exist he was not harmed at all by the exclusion of the question.    *State* v. *Duelks,* 97 *N. J. L.* 43, 48.    Whatever the fact, defendant did not pursue the matter any further.    The argument for this objection was "that it was proper cross-examination into the situation of the witness with respect to the parties, the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment and description, which were all fully investigated and ascertained for submission to the consideration of the jury, who had an opportunity of observing the witness' demeanor and of determining the just weight and value of his testimony; and, furthermore, the examination was chiefly confined to the point in issue, and the witness was being cross-examined upon relevant facts connected with the main issue."    Not a word to the effect that he should be discredited because of conviction of crime.    Mosley can take nothing by this objection.

As to all other questions concerning evidence argued for Mosley where there was any ruling of the trial court, no wrong or injury was done to the defendant, and, consequently, there can be no reversal on that ground.

It is next urged that it was error in the trial court to permit the prosecutor during the summing up to use and display a pistol before the jury which was not in evidence, the state not having the weapon with which the crime was committed.    This was objected to, and when the objection was overruled and exception was taken, which was signed and sealed.    The objection is that there was no testimony to show what the gun which was used looked like, one witness having said the barrel was six to eight inches long and

another from three to three and a half inches; that it was a particular sort of a gun.

It could make no difference to the defendant what the witness testified was the length of the gun's barrel. The testimony was that defendant killed Tucker by a pistol shot, which he admitted, claiming it was accidental (which defense has been adandoned here, as already stated—the claim now made in defendant's behalf being that the killing was murder of the second degree). But, quite aside from the character of the pistol used, it could not have injured the defendant to have the prosecutor of the pleas make use of a pistol before the jury by way of demonstration in summing up in a case in which the defendant himself stated he accidentally shot the deceased, and that with a pistol. The court may, in its discretion, permit counsel to make use of physical objects in illustrating his remarks to the jury. 38 *Cyc.* 1484. It is within judicial discretion to permit experiments relevant to the issue to be made before the jury during a trial. *State* v. *Harris,* 1 *N. J. Mis. R.* 526; 124 *Atl. Rep.* 602. This contention must be overruled.

The next error alleged is that the judge precluded the jury from finding the defendant guilty of murder in the second degree by erroneously defining the law of that offense. As already stated, the defendant was convicted of murder in the first degree, and, it not being alleged that the definition of that crime was erroneous, we conclude that it was correct without examining it. And because the jury convicted the defendant of murder of the first degree, the judge's definition of murder in second degree need not be examined and passed upon, because it could not have been harmful to the defendant. In *State* v. *Moynihan,* 93 *N. J. L.* 253, affirmed on the opinion of the Supreme Court, the Supreme Court said (at *p.* 256) : "As it appears that the defendant was convicted of murder in the second degree, it becomes unimportant, under the evidence, whether or not the court properly defined murder in the first degree. The erroneous definition could not possibly have prejudiced him, since the jury practically acquitted him of murder in the first degree by finding him guilty of murder in the second

degree." Now this, as a principle of law, is equally applicable to a case where the jury find a defendant guilty of murder in the first degree, thus eliminating second degree. That this rule works *a converso* is apparent from what this court said in *State* v. *Banusik*, 84 *Id.* 640 (at *p.* 652), that "the evidence which, in the minds of the jury, proved the defendant's guilt beyond a reasonable doubt, settled with equal certainty the degree of his guilt, and the court would have been entirely justified in charging the jury that, if they found him guilty, they must, under the proofs in this case, convict him of murder in the first degree," which, of course, would have excluded conviction of murder in the second degree and rendered innocuous an erroneous definition in the charge with respect to that degree.

The judge having charged the jury that—

"The distinguishing feature between the degrees of murder is the intent with which the homicidal act was done. The presumption of law is that all homicides are murder, but there is the further presumption that it is murder in the second degree. The burden of proving affirmatively that the accused is guilty of murder in the first degree rests upon the state."

Then defined murder in the second degree as follows:

"Murder in the second degree presents those classes of murder which are intended to do mere bodily harm, without intent to take life, or, where the act is done in the heat of passion, but without justification and lacking the other elements of the highest degree of crime, premeditation, deliberation and willfulness."

And the argument is that the court's definition of second degree murder was too narrow, that to constitute murder in the second degree the intent must be not to do *mere,* but *great* bodily harm.

Now, as the jury found the defendant guilty of murder in the first degree, and there was sufficient evidence to support that finding, and which was not against the weight of the evidence, the defendant is not harmed by the erroneous charge with reference to murder in second degree, assuming that there was error in that respect. *State* v. *Mellillo,* 77 *N.*

*J. L.* 505; *State* v. *Jayson,* 94 *Id.* 467. It is true that both these cases hold that the errors complained of in them were prejudicial only to the state and not to the defendant. In the Mellillo case the defendant was convicted of murder in the first degree. Mr. Justice Garrison, writing the opinion of this court, said that whether or not the definition of murder in the first degree as complained of by the defendant was error, that six times in a single paragraph the jury had been told that premeditation was an indispensable element of murder in the first degree, and that when, therefore, referring to what had just gone before, the broader term "preconceived" was employed, the jury must have understood that what was meant was that sort of preconception which they had just been told was a requisite element of the statutory crime of murder in the first degree, and, while there was ground for verbal criticism, there was none for reversal. The court then went on to hold that the definition of murder in the second degree was erroneous; that it was too favorable to the defendant, but the jury having found that the defendant's act was deliberate and premeditated, neither the state nor the defendant was injured by the erroneous statement of the law. Therefore, this case is not authority to the effect that an incorrect definition of murder in the second degree is harmful to a defendant, where the jury find the defendant guilty of murder in the first degree under proper instructions as to what constitutes that crime.

In the Jayson case defendant was indicted on two counts, one for simple assault and battery and the other for atrocious assault and battery. He was convicted of simple assault and battery. He made the point that the judge erred in his instruction upon the right of self-defense; but this court said that it was unnecessary to deal with the contention further than to say that, if erroneous, the error was prejudicial only to the state and not to the defendant, and, of course, would not lead to a reversal, citing State *v.* Mellillo, in which the question of second degree murder was out of the case by the jury's finding; but in State *v.* Jayson the point on which this court observed that the charge was prejudicial to the state and not to the defendant, was in

the case notwithstanding the verdict, the question being present in the finding of guilt of any degree. Therefore, it is not a question of whether the error is prejudicial to the state and not the defendant where, by the verdict, the erroneous instruction is necessarily harmless, because concerning a question which is no longer in the case.

It is also objected that the charge of the court with reference to a possible recommendation to life imprisonment and the power of the court of pardons to practically change or overrule the verdict, was erroneous. The charge on that head was as follows:

"The law now provides that every person convicted of murder in the first degree shall suffer death unless the jury shall by their verdict, and as part thereof, upon and after considering all the evidence, recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed. Prior to the enactment of this statute the jury in a homicide case had no function to perform except the ascertainment and declaration of the guilt or innocence of the accused, and in case of his being found guilty to declare the degree of the crime. The punishment which should follow the conviction was a matter with which the jury had nothing to do. By force of this legislation, however, the jury may, in case they shall adjudge the defendant to be guilty of murder in the first degree, determine, within the limits fixed by the statute, what his punishment shall be.

"Naturally, one of the elements to be considered by you, in determining that punishment, is whether, if you shall by your verdict impose life imprisonment, it can be disregarded and set at naught by the court of pardons, and also that provision of the statute which provides that every convicted prisoner confined in the state prison for the term of his natural life, whose record of conduct shows that he had observed the rules of the institution and who has served not less than fifteen years, may be released on parole, plus good time off."

The argument is that the court restricted the jury to finding *from the evidence* that the defendant was entitled to a

recommendation, instead of allowing the jury an untrammeled discretion, and that, if the jury imposed life imprisonment, such a verdict could be disregarded and nullified by the court of pardons. These contentions are unsound.

It is true that in the first Martin case (*State* v. *Martin,* 92 *N. J. L.* 437) this court held:

"The right given by the statute to a jury to recommend imprisonment for life upon a conviction of murder in the first degree, is subject to no restrictions, and need not rest upon any testimony, being within the unlimited discretion of the jury, and any instructions by the court, which tend to influence that discretion in any way, is beyond the power of the court and erroneous."

But the legislature in 1919 (*Pamph. L., p.* 303) provided that a recommendation to life imprisonment could only be made "upon and after consideration of all the evidence," which was construed in *State* v. *James,* 96 *N. J. L.* 132, 151, to mean all of the evidence adduced between the state and the prisoner on the issue of his guilt or innocence. Therefore, the judge charged correctly when he told the jury that by force of the legislation on the subject the jury might, in case they should adjudge the defendant to be guilty of murder in the first degree, determine, within the limitations fixed by the statute—that is, upon all the evidence in the case, what his punishment should be, having first charged that one convicted of murder in the first degree should suffer death, unless the jury by their verdict, and as part thereof, upon and after considering all the evidence, recommend imprisonment at hard labor for life, in which case that and no greater punishment should be imposed. In the second Martin case (*State* v. *Martin,* 94 *Id.* 139) the judge told the jury that the court of pardons was a court higher than the Oyer and Terminer, and might exercise the pardoning power of sovereignty as a court of pure mercy and grace; and if the defendant in a murder case is sent to a state prison for life that court might change the result of the verdict. And this court said it thought the remark was unfortunate, but could not say that the judge com-

mitted legal error or went beyond his right of comment, nor that harm was done to the prisoner; that the remarks of the judge were quite unnecessary, since the court supposed that every juryman must know of the existence of the court of pardons, and that it might change the result of their verdict by exercising mercy or grace. If, as in the second Martin case, the prisoner was not harmed by an instruction to the jury that the court of pardons could exercise the pardoning power of sovereignty and change the result of the verdict, then surely this prisoner was not harmed by the instruction that, if they consigned the defendant to life imprisonment, the verdict could be disregarded and set at naught by the court of pardons. Especially is this so by what was held in *State* v. *Schilling*, 95 *Id.* 145 (at *p.* 154), in which this court said that the instruction to the jury that the court of pardons might modify, change, reduce, abolish or set aside whatever result the jury might arrive at, whether they fixed the penalty as death or life imprisonment, as to that it was enough to say in answer that this court in *State* v. *Rombolo*, 89 *Id.* 565, approved a similar charge. And, by parity of reasoning, the defendant was not harmed by the instruction that by present legislation the minimum term of life imprisonment is fifteen years.

Upon the whole matter we are of opinion that no legal error was committed by the trial court, and that the judgment should be affirmed.

KALISCH, J. (dissenting). I cannot assent to the proposition declared in the majority opinion, that the erroneous definition given by the trial judge of what constitutes murder of the second degree was harmless error. It cannot be successfully disputed that under the evidence the jury might have properly found murder of the first or second degree or of manslaughter. The Chancellor, in the majority opinion, says: "Now, as the jury found the defendant guilty of murder in the first degree, and there was sufficient evidence to support that finding, and which was not against the weight of the evidence, the defendant is not harmed by the erroneous

charge with reference to murder in the second degree, assuming that there was error in that respect."

The trial judge defined murder of the second degree as follows: "Murder in the second degree presents those classes of murder which are intended to do *mere* bodily harm, *without intent to take life,* or where the act is done in the heat of passion, but without justification, and lacking the other elements of the highest degree of crime, premeditation, deliberation and willfulness."

Section 107, Crimes act (2 *Comp. Stat., p.* 1780), provides: "Murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate any arson, burglary, rape, robbery or sodomy, shall be murder in the first degree, and all other kinds of murder shall be murder in the second degree."

In *State* v. *Bonofiglio,* 67 *N. J. L.* 249, Chief Justice Gummere, speaking for this court, said (at *p.* 244) : "A reading of our statutes shows that the legislature, when it used the words 'deliberate' and 'premeditated,' meant that something more than the bare intent to kill should exist in order to constitute murder in the first degree, for it first specified two cases of homicide in which both deliberation and premeditation are present to a marked degree, viz., by the administration of poison and by lying in wait, and then declared that murder perpetrated by *any other kind* of willful, deliberate and premeditated killing should be murder of the first degree. The specification of these two cases is significant; it emphasizes the meaning which the legislature intended should be given to the words 'deliberate' and 'premeditated.' In our opinion, notwithstanding the great respect we have for the learning and accuracy of statement of the distinguished jurist who delivered the opinion of the Supreme Court in the Donelly case, the presence of a specific intent to take life is not, standing alone, conclusive that the homicidal act was done with deliberation and premeditation."

This logical reasoning cannot be successfully weakened. As a corrolary, the intent to take life does not raise a homicide

from a murder in the second to murder in the first degree. It is quite clear to me that the jury, a body of laymen, when instructed by the trial judge that murder in the second degree is committed where the intent is to do mere bodily harm, without intent to take life, would naturally understand that in order to find the ,accused ·guilty of murder in the second degree the evidence must not only show that the intent of the accused was to do *mere* bodily harm, but it was without the intent to take life. This was manifestly error and harmful.

Firstly, the intent must be to do *grievous,* and not mere bodily harm, in order to constitute murder in the second degree. Secondly, an intent to take life does not, *per se,* raise murder in the second to murder in the first degree.

The trial judge was placing before the jury two classes of cases in which a verdict of second degree murder could be rendered, under the evidence; the first class being where the intent of the accused was "to do mere bodily harm, without intent to take life," which he defined to be murder in the second degree, and the second class, "where the act is done in the heat of passion, but without justification, and lacking the other elements of the highest degree of crime, premeditation, deliberation and willfulness." He, obviously, by his erroneous definition of murder in the second degree, prejudicially influenced the jury not to find a verdict of murder in the second degree if it came to the conclusion that the intent of the accused was to take the life of the deceased. For he expressly told the jury that if the intent was to do *mere* bodily harm, without intent to take life, it was murder in the second degree. The term "grievous bodily harm" has a definite legal meaning. It means a greater injury than "mere bodily harm." Worcester defines "grievous" to mean "in a generic sense, atrocious, heinous, heavy." This is also its meaning in a legal sense. *Rex.* v. *John Cox, Bril. Cr. Cas., Russel and Ryan* 362.

In view of the incontrovertible fact that there was evidence in the case under which the jury would have been warranted to render a verdict of murder in the second degree or of manslaughter, the reasoning of the prevailing opinion that

because the jury found the defendant guilty of murder in the first degree, and there was sufficient evidence to support that finding, and which was not against the weight of the evidence, the defendant is not harmed by the erroneous charge with reference to murder in the second degree, assuming there was error in that respect, is palpably illogical. It seems to me that the natural result of the statement of the trial judge that "murder in the second degree presents those classes of cases of murder which are intended to do mere bodily harm without intent to take life" * * * was to eliminate from the jury's consideration the issue whether or not the defendant was guilty of the lesser degree of murder; for if we give to what the court said a construction most favorable to the state, it was equivalent to saying that if the intent of the defendant was to do mere bodily harm, without the intent to kill. then it was murder in the second degree; but if his intent was to kill, it was murder in the first degree. An intent to take life is a constituent of murder in the first degree, though not a necessary element of murder in the second degree. For if the intent was to do only grievous bodily harm, and the victim dies, it is murder in the second degree. To constitute murder in the second degree it is immaterial whether the intent was to do grievous bodily harm or to take life, if the wound or hurt was inflicted with either intent, and the victim dies, it is murder in the second degree. But the trial judge, by instructing the jury that if the intent was to do mere bodily harm, without the intent to take life, and death ensued, then that was murder in the second degree, practically charged the jury that under the law, as he expounded it, a mere slap in the face or any unlawful force which inflicted bodily harm, however slight, and death resulted therefrom, would warrant a verdict of murder in the second degree, provided there was no intent to take life or to do more than mere bodily harm, or where the act is done in the heat of passion but without justification, and in the absence of all the elements of murder in the first degree— premeditation, willfulness and deliberation. This exposition of the law was palpably erroneous and prejudicially mis-

leading. The law is too well settled to need the citation of authorities that in the absence of any of these elements the criminal homicide is reduced from first degree murder to a lower degree. It is therefore obvious that the court's instruction to the jury eliminated the finding of a verdict of murder in the second degree, notwithstanding that at the commencement of the charge the jury was told that under the *form* of the indictment it could convict the defendant of murder in the first or second degree, or of manslaughter. By eliminating from consideration of the jury, in consequence of the erroneous conception of the trial judge of what constitutes murder in the second degree, the lesser degree of murder, he confronted the jury with the dilemma of either convicting the defendant of murder in the first degree or of finding him guilty of manslaughter. Facing such a legal situation, created by the court, it was but natural that an intelligent jury would be unwilling to find under the evidence in the cause a verdict of manslaughter, but might willingly and properly have found a verdict of second degree murder, had it not been influenced and misled by the instruction of the court that this could not be properly done in a case where there was proof of an intent to take life, or where there was an absence of all three elements of murder in the first degree— willfulness, deliberation and premeditation.

The question presented for the decision of the jury was this: Was the defendant, under the evidence and the law applicable thereto, as defined by the court, guilty of any of the degrees of murder or of manslaughter? How can it be said then with any show of sound reason where, as in the case here, which presented facts and circumstances upon which a jury might properly, under proper instructions from the court, as to the law, have found the defendant guilty of any one of the crimes above enumerated, that the charge to do mere bodily harm without the intent to take life was murder in the second degree had no tendency to prejudice the defendant upon the merits of the case? It is difficult to conceive of any statement of the law, coming from the court, that could have been more prejudicial and harmful to the de-

fendant. For the ordinary lay mind, as has already been observed, could only understand from such instructions that if there was an intent to kill it was murder in the first degree. To say that because there was sufficient evidence to support a finding of a verdict of murder in the first degree, and which is not against the weight of the evidence, the defendant was not harmed by the erroneous definition of murder in the second degree, would be an accurate legal view, in a case where, under the law and the evidence, there was no basis upon which a jury could properly find a lesser degree of homicide than that of murder in the first degree. But in the instant case, where, admittedly, in the charge of the trial judge and in the prevailing opinion, there was evidence upon which a jury could have properly found a verdict of a lesser degree than that of first, the statement that because there was sufficient evidence to support the verdict of the jury, and which was not against the weight of the evidence, therefore, the defendant was not harmed by the erroneous definition of murder in the second degree is startling to a legal conception of justice.

It cannot be said with any legal propriety that this concededly erroneous charge, as to what constitutes murder in the second degree, did no harm to the defendant upon the merits of the case, because there was testimony which would sustain a verdict of murder in the first degree, for the reason that there was a phase of the case which would have warranted the jury in finding a verdict of murder in the second degree. Nor can we properly say with any degree of either legal or moral certainty that the instruction did not have a harmful or prejudicial effect upon the minds of the jury, for the human mind would naturally go to no further extent than to conceive that such a misstatement of the law had a tendency to mislead the jury in determining the degree of murder of which the defendant was found guilty.

This court, in *State* v. *Clayton*, 83 *N. J. L.* 673, 675, speaking by Mr. Justice Garrison, said: "It is argued that the error is harmless because in the body of the charge the degrees of murder had been accurately defined. So they had,

but how were the jury to know which was the law? Our theory of jury trials proceeds upon the fundamental assumption that the jury will take the law from the court, not that they shall be the judges of its correctness, or that as between two conflicting statements of the law they will unerringly single out the correct one."

In the present case the suggestion is, that since the jury rendered a verdict of murder in the first degree it must have found all the constituents of that degree of murder present, and therefore no harm was done to the defendant, is reasoning within a circle, and begs the meritorious question, which is, whether the jury, if properly instructed, might not have found murder in the second degree? It is clear to me that the jury was prevented from doing this as a result of the erroneous instruction. It is further to be observed that the method of reasoning adopted to sustain the verdict, notwithstanding the erroneous and misleading instruction, is palpably illogical. The verdict of the jury is wrongly made an essential part of the premises on which such reasoning is founded in order to uphold its validity. This is rather a novel method to reach a logical result. The verdict was the result of the premises, and, therefore, to make the verdict a part of the premises to establish that the jury was not misled is like unto placing the cart before the horse. In other words, the method of reasoning resorted to is by process of inversion, for instead of reasoning from the source leading to the verdict, it is attempted by the process used to reason .from the result, that is the verdict, to the source. the true premises which produced the verdict and of which the verdict could be no part, to establish that the erroneous instruction was harmless. The fallacy of this forensic philosophy is obvious, since it is conceded that the instruction as to what the constituents of murder in the second degree are was erroneous, and as that was a part of the premises, who can say with any degree of legal or moral certainty that if murder in the second degree had been properly defined it would not have resulted in a verdict of murder in the second degree? How could the jury have found otherwise than it did, in obey-

ing the instruction of the court, after being told that in order to find a verdict of second degree there must be an absence of the intent to take life, and the intent must be confined to do only mere bodily harm, or if the killing was done in a heat of passion there must be an absence of willfulness, premeditation and deliberation, constituents of murder in the first degree? Whereas the absence of any of these elements reduces murder in the first to murder in the second degree. If this instruction was not emphatic enough to influence a jury not to bring in a verdict of murder in the second degree, I cannot conceive of any more expressive terms that could have been used in that respect, except to have said directly what was said indirectly, that a verdict of murder in the second degree could not be properly rendered under the evidence.

Nor am I in accord with the views expressed in the majority opinion that the verdict was not against the weight of the evidence. I think it was. After a careful reading of the testimony I reached the result that the testimony warranted no greater verdict than that of murder in the second degree. There was no reliable proof that there was either premeditation or deliberation. For proof of premeditation the state relied on Lee Edwards, whose testimony was to the effect that on the morning of the occurrence of the homicide he saw the defendant in another pool room and heard him say to a person who was unknown to the witness that he was going to kill the deceased, in a tone of voice loud enough for him and others to hear. His testimony was contradictory and bore the earmarks of invention. Lee Edwards was not corroborated in any respect. The shooting was the outcome of a hot dispute between the defendant and the deceased in a room, such as is described in the prevailing opinion, and upon the deceased making some obscene retort to the defendant, the defendant shot him.

Moreover, the defendant was not, in my judgment, accorded a fair trial. Much hearsay testimony of a prejudicial and harmful character to the defendant was allowed to come into the cause. It is true that the counsel who appeared for

the defendant below offered no objection, either through incompetency or indifference, or both, to such testimony, but it seems to me that this culpable inertia of counsel did not relieve the judge from a duty, in a case where a defendant is on trial for a capital offense, from protecting him against improper influence being injected into the cause. For this reason alone there should be a new trial.

I am further of the view that the power vested in this court by the act of 1921, to pass upon the question whether a verdict is against the weight of the evidence, and if so to set it aside, is a power akin to the power exercised on a rule to show cause why a new trial should not be granted, therefore, it should be exercised in the same manner; and where it appears that a jury might have been influenced by incompetent testimony whether or not such testimony was objected to, or where it appears that a fair trial was not had, the verdict should be set aside. The conception that though the testimony was incompetent and was harmful and prejudicial, nevertheless, because such testimony came into the case without objection, the life of a human being shall be taken, is revolting to the sense of humanity and justice.

It is due to the counsel of defendant, who ably argued the case before this court, to state here that he was not the counsel who conducted the trial of the defendant at bar. As to the charge of the court relating to what the court of pardons may or may not do in the event of a conviction, &c., I concur in the views expressed by Judge White, in his dissenting opinion.

For the reasons given I vote to reverse the judgment, to the end that the defendant may have a new trial.

WHITE, J. (dissenting). I vote to reverse the death sentence in this case because I think the learned trial judge, in effect, charged the jury with reference to the question of recommending life imprisonment, that if they wanted the defendant to be adequately punished they should render a death verdict and not a life imprisonment verdict, as the latter could be "disregarded and set at naught by the court of pardons." Of course, as a matter of law, a death ver-

dict may be "set at naught" by the court of pardons, just the same as may a life imprisonment verdict, but the jury were not only so informed, but they were, as I think, impliedly instructed exactly the opposite.

That such a method of inducing juries to render capital verdicts is reprehensible, is, of course, obvious. A mere statement of the proposition pronounces its own condemnation. Even with reference to crimes and punishment of a lesser degree, it would be regarded as monstrous if a trial judge, in sentencing a convicted criminal, should avowedly impose a double penalty on the theory that if he did not do so the court of pardons might, ultimately, reduce the penalty to less than he thought it ought to be. How much more hideous it is when death is the greater penalty imposed to insure against an undue reduction of a lesser penalty. If a judge impose a double imprisonment penalty to insure a lesser one he had opportunity to rectify his error, not only during the six months' recall for resentence period, but afterwards by recommendation to the court of pardons; but when a trial judge has, in effect, seduced a jury into omitting the life imprisonment recommendation by erroneous telling them (at least impliedly) that in that way only may they insure against nullification of their verdict by the court of pardons, how can the wrong be remedied? No one knows what the jury would have done if the poison had not been administered. All that the record shows is a death verdict. Possibly, nay, probably, the jury would have rendered that verdict in any event. But who knows? Certainly not the court of pardons. Is that court going to step in and set aside the death penalty verdict when the evidence amply justifies such verdict, simply because the trial judge's erroneous language may have influenced the jury against a life imprisonment recommendation? Of course not. That function falls within the proper province of the Court of Errors and Appeals. And after the death penalty has been executed and a human life has been destroyed, what chance for rectification then? Certainly, none on earth.

But it is said that while language of trial judges tending to procure death penalty verdicts by the suggestion to the

jury of the possibility of action by the court of pardons, has been consistently condemned by this court, such language has, nevertheless, been held not to be cause for reversal. This is only partially true. What this court has said is that where the jury were told that the court of pardons might intervene as to any verdict they might render, whether of death or of life imprisonment, there was no cause for reversal. Certainly, this court has never said where the jury were, in effect, told that they had better bring in·a death penalty verdict if they wanted to provide against intervention by the court of pardons, that such instruction could be upheld.

In the present case the learned trial judge told the jury, "Naturally, one of the elements to be considered by you is whether, if you should by your verdict impose life imprisonment, it can be disregarded and set at naught by the court of pardons." The jury were not told that a death penalty verdict might likewise be so "set at naught." While this language is a quotation from the opinion of this court in *State* v. *Rombolo,* 89 *N. J. L.* 565, where the jury came in and asked the court as to the power of the court of pardons in case of a life imprisonment recommendation, it was used in that opinion rather in the way of comment and not as the essence of what was there held, which was that a statement of the entire power of the court of pardons was harmless. That opinion, after commenting on the fact that "naturally one of the elements to be considered by the jury," &c. (as above quoted), expressly said: "We see no reason why they [the jury] should not be informed of the power [obviously meaning the full power] of the court of pardons if they so desired, and, as a necessary consequence, we see no impropriety in the trial court either at the request of the jury or without such request, apprising that body with relation to the power of supervision possessed by the pardoning tribunal."

This language, while, perhaps, unfortunate in what has turned out to be its suggestive effect, was technically correct under the legislation (the act of 1916) as it stood at that time. Under that legislation the jury were not con-

fined to the effect of the evidence in the case, but might consider anything they chose in deciding whether or not to recommend life imprisonment. *State v. Carrigan,* 93 *N. J. L.* 268, in the Supreme Court, seems to have been decided also upon the effect of the act of 1916.

The act of 1919 was then passed and the life imprisonment recommendation was thereby made a part of the jury's verdict, and in deciding whether the recommendation should or should not be made, the jury were by that act confined to a consideration of the evidence in the case. This being the case, I am somewhat at a loss to understand how, under the act of 1919, the power of the court of pardons is a matter in any way relevant to the matter thus to be decided by the jury from the evidence. My own impression is that an inquiring jury might very properly be told that the functions of the court of pardons was a subject with which they had no proper concern in the rendition of their verdict, and that most emphatically in the absence of an inquiry from the jury the court should not volunteer any suggestion upon the subject no matter how fairly made.

But where, upon inquiry from the jury or without it, the court does charge the jury upon the powers of the court of pardons, the question of error requiring reversal is another matter, and depends upon whether or not the instructions was injurious to the accused. Where the instruction has been full and complete, and not as here one-sided and misleading, this court has refused to reverse.

In the second Martin case (*State v. Martin,* 94 *N. J. L.* 139) the jury were told that "the court of pardons is a higher court than the Oyer and Terminer, and may exercise the pardoning power of sovereignty as a court of pure mercy and grace, and if a defendant in a case of this character is sent to state prison for life, that court may change the result of the verdict." Obviously, the last part of this sentence was going very close to the objectionable line, and regarding it this court said: "We think the remark was unfortunate," but as the fact remained that the jury were, in effect, also told that the sovereign pardoning power of the court of pardons was above the sentences of the Court of Oyer and

Terminer, whatever those sentences were, this court said that the remarks, while unnecessary, were, doubtless, not harmful, as every juryman must know of the existence of the court of pardons.

In *State* v. *Schilling,* 95 *N. J. L.* 145, the court charged that the court of pardons might modify, change, reduce, abolish or set aside whatever result the jury might arrive at, whether they fixed the penalty as death or life imprisonment, and this court said: "The power of the court of pardons is a constitutional one of common knowledge, and its statement to the jury was a sound legal proposition not harmful to the defendant, nor error in law, *when, as in this case, it was applied to any verdict the jury might return."*

This Schilling case, which is the last word of this court upon the subject, seems to me to indicate the true doctrine, which is, that while it is quite unnecessary for trial judges to volunteer instructions of this character, tending as they do to bring discredit upon and public lack of confidence in the somewhat difficult work performed by the court of pardons (which work, by the way, is performed under conditions resulting from our penal legislation, whereby innocent women and children in a large majority of cases are the ones who suffer the punishment for crimes, while the actual culprits are supported by the state in degenerating idleness, instead of being required to work at real wages, supplied by the proceeds of their toil, for the support of their families), nevertheless, if trial judges see fit to take this action, it must be done in fairness to the defendant, whose life is at stake, and not, as here, in a misleading and one-sided manner, the effect of which is to improperly influence the jury. I think the matter sufficiently important and the error so manifestly harmful as to require a new trial of the present case.

I am also of opinion that the evidence of first degree instead of second degree murder was so meagre and unreliable as not to justify the affirmance by this court of a verdict imposing the death penalty.

For the above reasons I vote to reverse.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, KATZENBACH, LLOYD, GARDNER, VAN BUSKIRK, JJ. 8.

*For reversal*—KALISCH, BLACK, CAMPBELL, WHITE, MC-GLENNON, KAYS, JJ. 6.