THE STATE OF WYOMING, Plaintiff and Respondent,

v.

CLEVELAND BROWN, JR., Defendant and Appellant.

(No. 2288; Sept. 26, 1944; 151 P. 2d 950)

380

For the Plaintiff and Respondent there was a brief by Louis J. O'Marr, Attorney General, M. R. Foe, Deputy Attorney General, both of Cheyenne, Wyoming, and William S. Edmonds, of Kemmerer, Wyoming, County and Prosecuting Attorney of Lincoln County, and oral argument by Mr. Edmonds.

For the Defendant and Appellant there was a brief and also oral argument by Patrick J. Quealy and Ivan S. Jones, both of Kemmerer, Wyoming.

382

## OPINION

Blume, Justice.

On October 11, 1943, the County and Prosecuting Attorney of Lincoln County, Wyoming, filed in the Office of the Clerk of the District Court of Lincoln County, Wyoming, an information charging the defendant, Cleveland Brown, Jr., hereinafter called defendant, with the crime of murder in the first degree for killing one Elizabeth Kusnirik on October 1, 1943. On October 13, 1943, the defendant was brought into court and arraigned. The court inquired as to whether or not he had an attorney and defendant answered that he did not, and stated that he did not have any money. The following colloquy between the court and the defendant appears: "Q. The Court: You understand, of course, this is a very serious offense, charging you with murder in the first degree and if you plead guilty to this offense the jury may make a recommendation as to the nature of the penalty that may be imposed by the Court. Before you plead to this information do you wish to talk to a lawyer? A. Well, I tell you, Judge, I haven't got no relations up here, no friends at all—no one up here. I came here to work for the railroad on the section and therefore I ain't got nothing to say, just one thing and that is I am guilty. That is all I got to say about it. Q. What do you say, Mr. Brown, are you guilty or not guilty of the offense therein charged? A. Well, I am guilty." Thereupon a plea of guilty was directed to be endorsed upon the information, but the court stated that before disposing of the case he would appoint counsel for the defendant and appointed Ivan S. Jones, Esq., to represent him. On October 23, 1943, the defendant again appeared in court, accompanied by Ivan S. Jones, Esq., and Patrick J. Quealy, Esq., his counsel. The court was informed by counsel that they wished to

withdraw the plea of guilty theretofore entered and enter a plea of not guilty by reason of insanity. Thereupon the following colloquy took place between the court and the defendant: "Q. The Court: You understand that, Mr. Brown? * * * that you withdraw your plea of guilty and enter a plea of not guilty by reason of insanity? You desire to do that do you? A. The only thing I say, Judge, I am guilty of it. The Court: What? A. One thing I say, I am guilty of the whole crime, I done it. The Court: Perhaps you will take the advice of your attorneys and the Court will order that your plea of guilty be withdrawn and the plea of not guilty by reason of insanity be substituted therefor. A. That is all I got to say about it; I am guilty, I done it." The clerk thereupon was directed to endorse on the information a plea of not guilty by reason of insanity. The court upon request of counsel fixed 15 days for observation of the defendant by physicians, and it appears that later the defendant was taken to the hospital for the insane at Evanston, Wyoming, for the period of 30 days for further observation as to his sanity. On December 14, 1943, the defendant was again brought into court and the following colloquy took place between the court and the defendant:

"Q. The Court: Counsel at this time inform me that you desire to withdraw that plea and enter a different plea. You have consulted with your attorneys about this matter; have you talked with them about it? A. Yes, I have talked to them. Yes, I have told them the same thing that I told you, that I was guilty of this crime. Q. You desire to withdraw the plea you made the last time you were in and substitute another plea? A. Yes, sir. Q. You desire to withdraw the plea you made before and make a different plea? A. I don't know, sir, I just tell you all I got to say about it. I don't know much about the Court. I never

been in Court before. I am just guilty of the crime * * * I never have been in any trouble before. The first time I have been in trouble or anything. The only one thing I say, I am just guilty of the crime. * * * The Court: I understood from what you say that you desire to withdraw your former plea. You came in sometime ago and told me things that you did and you afterwards changed it and another different plea was entered. I understand now you desire to withdraw the plea you made the last time you appeared before me and now to enter a plea of guilty. Is that what you desire to do? A. That is all I got to say about it, I am guilty of the crime. Q. The Court: Before you are arraigned on the information at this time I want you to understand the seriousness of the offense. You are charged, of course, with murder in the first degree and before you enter your plea of guilty the Court wants to inform you so that you will understand that the penalty may be either death or life imprisonment as may be determined by the jury. You understand that, do you? You understand that you have to be punished. You committed a crime and you have to be punished. A. Yes, sir. The Court: And that punishment may be either death or life imprisonment. You understand that, do you? A. Yes, sir. Q. With that understanding, you desire to plead at this time? A. That is all I got to say, I done it. The Court: What do you say, Mr. Brown, are you guilty or not guilty of the offense charged in this information? A. I told you what I am going to say—guilty." Thereupon a jury was impaneled to determine whether or not the defendant should suffer death or be imprisoned for the term of his life. The jury returned a verdict finding the defendant guilty of murder in the first degree, as charged in the information, without recomendation that he should be imprisoned for life. Thereupon on December 17, 1943, the court entered judgment

and sentence directing that the defendant should die at the State Penitentiary on the 11th day of February, 1944. From that sentence the defendant has appealed to this court, and we entered an order on January 26, 1944, suspending the execution of the sentence during the pendency of the appeal in this court.

The salient facts, briefly told, are as follows: Elizabeth Kusnirik, the deceased, was an elderly woman of over 70 years of age, residing in Kemmerer, Wyoming. She appears to have been a woman of average strength, health and habits, considering her age, and living normally at the time of her death. She was apparently able to engage in the usual activities of a woman of her age, raising a garden, cooking the meals for her son, and visiting around the neighborhood in which she lived. The deceased was missed from her home by her son, Albert Kusnirik, when he went to supper on the evening of October 1, 1943. He waited for sometime but she did not appear and so he left home to go up town. He did not become alarmed by reason of her absence from home until he returned late at night of October 1, 1943, and he then organized a searching party to search for his mother. The body of the deceased was found early in the morning of October 2nd, 1943, in the general vicinity of her home, at a place which was isolated and partially covered by willows and brush. Her body was found placed on the grave of a dog. Those finding the body testified that she was lying on her back, arms thrown back, legs apart, and clothing considerably disarranged around the upper part of the body. The bloomers, usually worn, were missing. One shoe was lying some distance from the body. A package carried by the deceased and containing lettuce, was also lying some distance from the body. These witnesses testified to some bruises or lacerations on the head of the de-

ceased, and to some other minor injuries. The evidence of the medical examiner who performed the autopsy corroborated the fact of the bruise upon the head of the deceased, indicating that she was struck with some force. He refused to conclude, however, that the blow alone had been the cause of the death of the deceased. He testified, judging from an examination of the body of the deceased, a rape had been committed upon her and substantially completed. His testimony, taken as a whole, indicates that the death ensued not alone from the blow on the head and the act of the rape, and the shock resulting therefrom, but, apparently, from the combination of such acts coupled with the age of the deceased and her constitutional inability to recover from the combination of the violent acts so committed upon her. A dentist also testified in the case, describing teeth marks which were found upon the body of the deceased. One witness testified that the defendant made a statement to him during the evening of October 1, 1943, to the effect that he had a fight with a white woman and that he almost had to kill her. No witnesses were called on behalf of defendant, nor did he himself testify.

The defendant made a confession of his crime before the Prosecuting Attorney. It was taken down in shorthand and was introduced in evidence. It was not signed since the defendant apparently could neither read nor write. The record shows that he was warned to the effect that he did not need to testify against himself and that whatever statement he might make could be used against him. The defendant answered that he understood that. "Q. In this matter across the river (referring to the place where the deceased was found) that you are charged with—you understand that there has been a charge made against you? A.

Yes, sir. Q. Now did you do that or not? A. Yes, sir. Q. You did do it? A. Yes, sir, I am guilty, I done it." He then spoke of the place where the deceased was killed. He implicated one Frank Miller in the crime and a good deal of his confession relates to that. He asserted that he and Miller both raped the deceased between 4:00 and 5:00 o'clock in the afternoon of October 1, 1943. He thereafter, according to his confession, went up town, had a drink, and started to shoot craps and play cards. He had on some brown pants and did not change them. "Q. Now then, I want to ask you again, you realize these things you have said might be used against you? A. Yes, sir, I am guilty of mine, I have told you the truth about it. Q. And you are willing to make these statements to me of your own free will? A. Mr., you asked me for the truth. Q. Yes? A. That is what I am trying to tell you, the truth—yes, sir, one thing I can say, I am guilty of mine, that is all I got to say. It was in the evening, the sun hadn't gone down. Q. Weren't you afraid somebody would catch you? A. Well, I am going to tell you, you take a person when he is drinking he don't think and I have been suffering with those spells. Q. What kind of spells? A. Well, every change of the moon, I don't know what causes it, I just lose my mind, lose control. When they had me in the Ogden jail the doctor come to me and couldn't do me any good and they sent me to Salt Lake to the hospital and—first to the County Jail and I suffered the changes of the moon. That is when they picked me up for selective service. Q. Do you know what causes these? A. I don't know, I have been suffering them all my days, I don't know what causes them. Q. You have been suffering them all your life? A. Yes, sir. Q. You had them when you were a little boy? A. Yes, sir. Q. Can you tell what goes on those times? A. No, sir, I don't remember nothing. The nurse and doctor in Salt Lake said I

laid there better than 16 hours before I ever come straight. Q. Had you been drinking then. A. No, sir. Q. At the time you say you and Miller raped this woman, you had been drinking then? A. Yes, sir. Q. Quite a bit? A. Yes, sir. Q. You were pretty full? A. Yes, sir, I am drinking highballs and there was all these white boys and they had a drink around and bought me drinks of gin and whiskey and the first thing I know I lose control. * * * Q. I think that is all, this is pretty bad. A. Yes, sir, but I am guilty of mine, I am guilty and I will stand up to the last, I am guilty. * * * There is one thing I am saying, I am glad when I get out from there, I am sick of laying up there. I ain't got no more to say about it, I am guilty of mine, that is all I will say." According to defendant's statement, he went to Montpelier, Idaho, that evening. He subsequently exonerated Frank Miller from any participation in the crime, admitting that he alone committed it. On October 19, 1943, the defendant called the sheriff to the jail, according to the latter's testimony, and stated to the latter, "Why are these fellows (referring to defendant's counsel) bothering me all the time? I have told them I am guilty and I was alone when I committed the crime." And defendant called the sheriff again two days later, and stated, "I wish them fellows would leave me alone. If they are going to send me to the 'pen' I wish they would send me to the 'pen'; if they are going to kill me, I wish they would kill me and get it over with."

Counsel for defendant, to shed further light on the case, have made the following statement in their brief: "The defendant in this case is a colored man who was tried in a community where Negroes constitute a very small percentage of the normal population. He is ignorant and unschooled almost beyond belief. He is without friends or relatives within this whole section

of the country. At the time of his arraignment and continuing until the present time he has been almost completely without funds. He of course knows no law, and is completely ignorant of normal legal procedure or the operation of our courts. This defendant was charged with a heinous crime, the details and brutality of which has stirred the entire community to a point where it was only the judicious handling of publicity on the part of the county attorney and the officers serving with him that prevented an extra-legal execution by the populace. * * * The defendant seemed to be suspicious of the counsel who were appointed to defend him and of the entire procedure with which he was faced. He refused to confide in counsel even the most elemental facts surrounding his activities either during the commission of the crime or before or after its commission. This lack of confidence was so apparent that counsel requested that the Judge question defendant in regard to the advisability of securing other counsel. This was done. Under these circumstances, both counsel appointed by the Court and the Court itself proceeded with extreme caution and with hesitancy because of the very real fear that a miscarriage of justice might result and that the law would be perverted to an unjust end."

I. Counsel for the defendant state, "It is suggested as one of the questions which this court must decide before they may conscientiously order the execution of the sentence imposed by the lower court, that perhaps the defendant did not have sufficient intelligence to comprehend the nature of the plea which he was entering." But we have, of course, no effective way of determining the mental capacity of the defendant. No evidence on that point appears in the case, except what may be gathered from the statements contained in the confession of the defendant before the Prose-

cuting Attorney, and the circumstances and facts in the case. The defendant was confined in the County Jail for the period of 15 days for the purpose of observation. He was later sent to the State Hospital for the Insane at Evanston, Wyoming, for the purpose of observing his mental capacity. The record does not show anything in regard to the results of such observation; however, defendant was presumably discharged from the State Hospital upon finding that he was sane. We have purposely set out some of the colloquys between the court and the defendant and between the prosecuting attorney and the defendant, thinking that this would, to some extent, show the mental capacity of the defendant. Considering these, we are unable to say that the defendant did not comprehend the plea which he entered in the case, or that he did not fully comprehend the atrocity of his crime and that he deserved the extreme penalty under the law. See Shaughnessy v. State, 43 Ariz. 445, 32 P. 2d 337. Two able counsellors, appearing for the defendant in the court below, and in this court, who were anxious to protect the defendant's rights as fully as that could be done, permitted him to change his plea from one of not guilty on account of insanity, to one of guilty. The trial judge had defendant before him on several occasions and interrogated him, and evidently, when passing sentence, considered him to be sane. It is probably true that the defendant has no high degree of intelligence; if he had, he would not, it would seem, have committed the heinous crime shown by the record. But the law does not discriminate between degrees of intelligence in fixing the penalty for murder. Foster v. State, 37 Ariz. 281, 294 P. 268; State v. Markham, 100 Utah 226, 112 P. 2d 496. It is said in 22 C.J.S. 124-125, "The general test of responsibility for crime may be stated to be the capacity to under-

stand the nature and consequences of the act charged and the ability to distinguish between right and wrong as to such act. * * * While accused should apprehend the nature and quality of his act in order to be guilty, it is not essential to guilt that his mental condition be such as to enable him to realize the fullest extent of his act; and it has been said that the test is not whether accused knew the gravity or seriousness of the act he committed, but whether he knew the nature and quality of the act, and whether he knew that it was wrong." Applying these rules, we are not, we think, warranted in saying that the defendant did not know right from wrong, or the nature of the crime which he committed.

II. Sec. 32-201, Wyo. Rev. Statutes, 1931, states as follows:

"Murder in the first degree. Whoever purposely and with premeditated malice or in the perpetration of, or to attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree, and shall suffer death, but the jury may qualify their verdict by adding thereto, 'without capital punishment' and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment, at hard labor, for life."

We held in State v. Best, 44 Wyo. 383, 12 P. 2d 1110, that a defendant may plead guilty to murder in the first degree, but that the jury must determine whether he shall suffer death or life imprisonment. We have no reason to depart from the rule of that case. A plea of guilty is equivalent to a conviction, leaving, under our statute, to the jury, only the question of the alternative punishment provided by the statute. 22 C.J.S. 656. All facts necessary to judgment in the alternative as mentioned are admitted by the

plea of guilty. Such plea dispenses with proof of the corpus delicti. Ramos v. State, 58 Nev. 446, 83 P. 2d 147; People v. Yerman, 138 Misc. Rep. 272, 246 N. Y. Supp. 665. It also dispenses with the proof of venue. People v. Bellon, 180 Cal. 706, 182 P. 420; Dusenberg, v. Rudolph, 325 Mo. 881, 30 S.W. 2d 94; Hines v. State, 9 Humphreys (Tenn.) 720. It admits that the defendant is guilty as charged in the information. State v. Best, supra. In view of these rules of law, counsel for the defendant argue that no evidence of the circumstances of the crime should be introduced in evidence when the defendant pleads guilty. They call our attention to the rule that the jury should be left untrammeled by any instructions of the court in exercising their discretion as to the punishment to be imposed. That is undoubtedly the rule by the great weight of authority (Hernandez v. State, 43 Ariz. 424, 32 P. 2d 18, and cases cited; 4 Warren on Homicide, Perm. Ed. 505; cases cited in dissenting opinion State v. Carroll, 52 Wyo. 29, 69 P. 2d 542), although, according to some authorities, an instruction stating that the discretion should be based on the evidence, while not approved, is held not to be prejudicial error. People v. Bollinger, 196 Cal. 191, 237 P. 25, and cases cited; State v. Riley, 41 Utah 225, 126 P. 294, on Rehearing. Counsel claim that "by the very introduction of evidence on the part of the State, the inference which any jury must necessarily draw is that its finding and the exercise of its discretion will necessarily be based upon the evidence which has been presented to it, and upon nothing else." The jury were instructed that "Under the laws of the State, a person who is found guilty of murder in the first degree shall suffer death or be imprisoned in the penitentiary for life, in the discretion of the jury trying the case." It is hard to see how, under this language used in the instruction, the jury would draw the inference men-

tioned by counsel for the defendant, unless, perchance the jury misconstrued the term "discretion," which is not likely since it is a well understood term. It may be, though we do not decide the point, that if counsel in a case think that the term might be misconstrued by a jury, they could ask, and have given, an instruction making it clear that their discretion would be untrammeled notwithstanding evidence showing that the defendant deserves to suffer death. We cannot in this case assume that the jury misunderstood the meaning of the term.

Counsel for the defendant admit that in cases in which the trial judge imposes the punishment, without the aid of a jury, it is proper for him to inquire into the circumstances under which the crime was committed. See 24 C.J.S. 1202-1207; 15 Am. Jur. 167, § 519; 26 Am. Jur. 582. But counsel believe that the rule should be different in cases in which the punishment is fixed by the jury, in view of the fact that they might be unduly influenced by testimony. They contend that the confession was improperly admitted, and they say further that, "It is suggested to this Court that all of the evidence which related to the position and description of the body, the age and the character of the deceased and the possible flight of the defendant, were all such matters as would serve only to inflame the minds of the jurors with a desire for vengeance, rather than a sincere desire to effect the real purpose of legal punishment." It may be that the same latitude should not be allowed when the jury fixes the penalty, which would be permissible when the trial judge does so but it is quite apparent that the same reason for examining into the circumstances of the commission of the crime exists equally in both cases. While, as stated, the discretion of the jury to impose the penalty of death or life imprisonment is

untrammeled, they cannot, in the very nature of things, bring in an intelligent verdict, unless they know the circumstances under which the crime was committed, and all the surrounding facts, including the age of the defendant, his intelligence, his mental condition at the time of the commission of the crime, and other relevant facts which might properly aid the jury in exercising their discretion. It is hardly credible that the statute contemplates that the jury shall exercise their discretion blindly and without knowledge of the facts. That must be true in cases in which the defendant pleads guilty as much so as in those cases in which he pleads not guilty, and that, too, notwithstanding the foregoing rule that the jury should be left untrammeled by any instruction of the court in exercising their discretion. 30 C.J. 456. Thus in Perry v. State, 102 Ga. 365, 379, 30 S.E. 903, the court stated:

"This court has frequently decided that the judge can not properly undertake to give to the jury any rules to aid them in reaching a conclusion as to what they should do upon the question of punishment. See Inman v. State, 72 Ga. 269, 280; Marshall v. State, 74 Ga. 32; Fry v. State, 81 Ga. 646, 650; Vann v. State, 83 Ga. 46, 56, 57; and there are other cases to the' same effect. It by no means follows that the jury should capriciously exercise their power in this respect. The law does not mean, nor will it do to assume, that jurors may, or will, be guided in so important a matter by mere whim, or by prejudice one way or the other, or by any improper consideration. They have a broad discretion, it is true, but one which the law-making power intended should be wisely and prudently exercised, *in the light of the evidence*. Surely it was never contemplated that they might, without regard to the facts and circumstances of the case, arbitrarily and without reason act upon the question of punishment. As we understand it, they should, in a murder case, by saying nothing upon this question, allow the penalty of death to be inflicted, unless in their de-

liberate judgment it is, in view of all the proof, right and proper to spare the murderer's life and send him to the penitentiary."

In People v. Rollins, 179 Cal. 793, 179 P. 209, 210, the court stated:

"It has several times been held that the discretion given to the jury to provide for life imprisonment in such a case is not an arbitrary discretion to be exercised without regard to the circumstances of the particular case, but only where it appears to the jury that there is some circumstance that warrants or justifies the imposition of the lesser punishment. If course, the conclusion of the jury on such a matter is final."

In People v. Valenzuela, 7 Cal. 2d 650, 62 P. 2d 142, 144, the court stated:

"It is not to be understood by what we have said herein that we have assumed to limit the power of the jury in the reasonable exercise of its discretion arising out of the facts and circumstances connected with the offense charged. The proper punishment to be imposed is to be determined by the jury after a full consideration of all the evidence adduced at the trial, including that of the defendant, and its discretion which, of course, should not be arbitrarily or captiously exercised, rests wholly within the province of the jury, and when exercised in mitigation of the punishment is not a matter which the court may review."

Hence the courts which have had occasion to pass on the point before us, have held that the circumstances of the crime may be shown when the defendant has pleaded guilty. State v. Davis, 6 Wash. 2d 696, 108 P. 2d 641; U. S. v. Dalhover (C.C.A.) 96 Fed. 2d 355, certiorari denied 205 U. S. 632; 83 L. Ed. 406; 59 Sup. Ct. 154; Reppin v. People, 95 Colo. 192, 34 P. 2d 71; Triplett v. Commonwealth, 272 Ky. 714; 114 S.W. 2d 1108; Houston v. Commonwealth, 270 Ky. 125, 109 S.W. 2d 45; Cornelison v. Commonwealth, 84 Ky. 583, 2 S.W. 235; Mounts v. Commonwealth, 89

Ky. 274, 12 S.W. 311; Williams v. Commonwealth, 25 Ky. Law 2041, 80 S.W. 173; See 9 University of Chicago L.R. 715-722. In 24 C.J.S. 47, the rule is stated as follows:

"Where the power to assess the penalty after a plea of guilty reposes in the jury, evidence is admissible for the purpose of assisting them in doing so, and where the statute so provides such evidence is required. The plea of guilty, in other words, neither prevents nor renders unnecessary evidence bearing on the question of punishment, despite the fact that such evidence incidentally proves the admitted guilt. Accused may waive the introduction of evidence by the state, and an express waiver cannot be withdrawn after the verdict. The rules concerning the admissibility of evidence have been said to be generally the same as those applicable when the trial is on a plea of not guilty, at least to the extent that irrelevant and incompetent evidence should be excluded, and evidence admissible for a limited purpose should be so limited by the court."

In State v. Davis, supra, the supreme court of Washington, in a case like that at bar, stated as follows:

"In the case at bar, it was necessary that a trial be had, nothwithstanding appellant's plea of guilty, in order that the degree of murder might be determined by a jury. Appellant had made a confession, and had pleaded guilty, but the State was bound by neither, nor limited in the method of proving its case. Maddox v. State, 108 Neb. 809, 189 N.W. 398; People v. Parisi, 190 Cal. 542, 213 P. 968; Reeves v. State, 116 Tex. Cr. R. 451, 32 S.W. 2d 471; Curtis v. State, 119 Tex. Cr. R. 398, 46 S.W. 2d 303. In making its case, the the state was entitled to introduce any evidence which was competent, relevant and material to the issue to be determined by the jury. That a portion of the evidence so offered might incidentally tend to show that appellant had been guilty of some other and separate offense is unimportant if the evidence tended to sup-

port the state's contention in the case being tried, and was admissible under the general rules of evidence."

In State v. Hardy, 339 Mo. 897, 98 S.W. 2d 593, a homicide case, the defendant pleaded guilty to the charge of murder. The trial court rejected the plea, and put defendant to trial before the jury. While the case is not exactly like that in the case at bar, it is interesting to note what the court said on the point under consideration here. The court stated in part:

"Upon a confession of guilt there is no technical common law general issue triable. However, in a first-degree murder case, under section 3984, supra, there remains for determination the punishment—death or life imprisonment—depending upon the extenuating or mitigating circumstances connected with the case. The law favors the trial of criminal cases, and the greater the offense a defendant stands charged with the greater is the caution exercised by and the greater is the reluctance on the part of the court in accepting a plea of guilty. A plea of guilty, without a narration of the facts upon which it is based, partakes to a certain extent of the nature of a conclusion; and should the court, accepting a plea of guilty to a first degree murder charge, after investigation ascertain the homicide was justifiable or excusable or murder of a lesser degree, it, in the administation of justice, should, and no one would deny its authority to reject the plea, apprise the defendant of his rights and thereafter proceed in the light of the actual facts disclosed. So, even though a plea of guilty, coupled with a consent to the imposition of the death penalty, may be said to eliminate all matters for determination, the solemn and momentous consequences justify such inquiry and investigation as in the exercise of a wise discretion seems proper to the court."

In cases where certain facts, for instance the homicide itself, are admitted, the principle involved is somewhat similar to the principle involved in the case at bar. In fact, judging from the cases cited by it, the court in State v. Davis, supra, considered the principle involved identical. That, perhaps, would not be

quite true except in cases in which the jury fixes the punishment. Wigmore on Evidence (3d Ed.) Section 2591, thinks that in such case "the trial Court's discretion should determine whether a particular admission is as plenary as to render the first party's (State's) evidence wholly needless under the circumstances." The Texas court considered this situation in Beard v. State, (Tex. Crim. Rep.), 171 S.W. 2d 869. In Texas the jury fixes the punishment, and the court said in part:

"In practically a large majority of the states of the Union it has been held that the state can not be controlled by admissions of contesting accused persons to any matter relevant in law to a conviction for the offense charged. To hold otherwise might relegate the State to the bare fact of a killing with no explanatory circumstances in order to allow the jury any latitude in the fixing of a proper punishment in the event of a conviction. If such were a true doctrine, then the State might be called upon to introduce no testimony at all, save the admission of the accused, thus leaving the course that the cause might take in the hands of an accused. Again, this doctrine, when carried to a final conclusion, might result in a trial upon special issues only as to a necessary fact not admitted by the one on trial, such as malice, or motive, or any other circumstance that might ameliorate or increase the punishment, and the State would find itself trying a portion of such case on a plea of guilty and another portion thereof on a plea of not guilty."

There is some diversity of opinion as to the nature of the evidence which may be introduced in cases such as before us. In Reppin v. People, supra, the majority of the court held, some of the justices dissenting, that evidence of other crimes not connected with the one at bar should not be introduced. The court substantially held that the rules concerning the admissibility of evidence, when a murder trial is upon a plea of guilty, are the same as those applicable when the

trial is upon a plea of not guilty. In U. S. v. Dalhover, supra, the majority of the court held that it was not error to admit evidence of other crimes. See also 41 C.J.S. 321. One of the three justices sitting in the case dissented, but stated, among other things: "I agree that all pertinent facts and circumstances which bear upon and would be admissible upon a plea of not guilty, should properly be heard by the jury. * * * I agree with the majority that all testimony concerning appellant's flight, pursuit, including his escapade with the officers in Baltimore, the arrest of appellant and his associates at Bangor, Me., the property in their possession at that time, the blood soaked shirt of the deceased worn at the time he was shot, and the exhibit of firearms with which appellant had been connected was properly admissible." We need not decide whether evidence of other crimes is admissible in cases such as this, since no question like that arises in the case. In State v. Long, 336 Mo. 630, 80 S.W. 2d 154, called to our attention by counsel for defendant, it appears that the defendant admitted the death of deceased, and the nature and location of the wounds. It was held that it was error to admit, over objection, the introduction of the bloody clothing of the deceased. See also Seadlund v. United States (C.C.A.) 97 Fed. 2d 742. We have no such case before us. We do not think that the nature of any of the evidence introduced in the case at bar was inflammatory. The position and description of the body, and the age of the deceased shed light on the gravity of the offense, and helped the jury to determine the punishment which should be inflicted. The confession, as well as the subsequent flight of defendant into Idaho, had a tendency to show, among other things, the intelligence and the character of the defendant, and constituted proper evidence to be taken into consideration by the jury.

III. The court instructed the jury on the various degrees of homicide; also on what constitutes rape, and that if a victim of rape is killed in the commission of the crime, the person guilty of such rape is guilty of murder; that while the plea of guilty entered by the defendant is a confession of guilt, the burden is on the State to prove the degree of the crime charged. In Instruction 8, the court told the jury:

"The Court instructs the jury that the information in this case charges the crime of murder in the first degree. Such information includes within its charge, murder in the second degree and manslaughter. The defendant has entered a plea of guilty to the information and by so doing has confessed himself guilty in the manner and form charged in the information and the sole problem presented to the jury is the determination of the degree of guilt, and if you find the defendant guilty of murder in the first degree it shall be your further duty to fix the penalty therefor in accordance with Instruction No. 11."

In Instruction 11, the court told the jury:

"Under the laws of the state, a person who is found guilty of murder in the first degree shall suffer death or be imprisoned in the penitentiary at hard labor for life, in the discretion of the jury trying the case. Therefore, in this case, if you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of murder in the first degree, it will then be your duty to determine the penalty which he shall suffer. If you find the defendant guilty of murder in the first degree and determine that he shall suffer the death penalty, then it will be your duty to return a verdict finding the defendant guilty of murder in the first degree and without qualifying words. If, however, you find that he should suffer imprisonment in the penitentiary at hard labor for life, it will be your duty to find him guilty of murder in the first degree, but insert in your verdict the words 'without capital punishment'."

Counsel for defendant contend that "all the instructions in this case which had to do with the burden

of proof and the degrees of homicide were erroneously given." That contention would seem to be correct, and would seem to follow from what we have already heretofore stated. A case close in point is Houston v. Commonwealth, supra, where the court said:

"The defendant took the stand and testified in his own behalf and insists that he was entitled to instructions upon manslaughter and self-defense, but he never withdrew his plea of guilty, which he might have done * * *, hence there was no error in the instruction given which was simply this: 'Gentlemen of the Jury: The defendant, John Houston, has entered a plea of guilty to the charge of the indictment in this case. You will therefore find the defendant, John Houston, guilty of wilful murder as charged in the indictment and fix his punishment at death or at confinement in the State Penitentiary for life in your discretion according to the proof.'"

We think, however, that the error was harmless. It is stated in 26 Am. Jur. 546, Section 556, as follows:

"Generally speaking, an accused cannot successfully complain of error in instructions which are favorable to himself. Consequently, one who has been convicted of a superior grade of culpable homicide is not to be deemed prejudiced by and cannot attack an erroneous charge in respect of a lower grade of homicide."

Soo to the same effect 30 C.J. 447, 41 C.J.S. 289-290. Counsel, in their brief, however, state:

"The instructions as given in this case followed in general the instructions which would have been given had the plea been not guilty. Under these instructions, the jury could not help but feel that it was called upon to determine issues of fact and not alone to use it discretion. The effect of these instructions was to tell the jury that the evidence which had been presented to it was introduced for the purpose of determining issues of fact and for limiting its discretion in the impositon of punishment."

It is true that the effect of the instructions was to tell the jury that the evidence which had been presented was for the purpose of determining the issues. But that, we think, was clearly in favor of the defendant and not against him. It limited the discretion of the jury in fixing punishment only to the extent of permitting them to find the defendant guilty of less than murder in the first degree, and permitting the punishment to be less than that prescribed for that degree. That too, clearly, was in favor of, and not against the interests of the defendant, and he cannot, accordingly, complain. Counsel for the defendant have ably done all they could do to save the life of their client. They have been true and faithful servants of the defendant, of the court, and of the law. Nothing more could be expected of them. The defendant has had a fair trial. Every precaution was taken to protect his rights. We cannot say that he was not justly sentenced to pay the extreme penalty for the grave crime which he committed, and the judgment is, accordingly, affirmed.

And now this court appoints Friday, the 17th day of November, 1944, for the execution of the sentence pronounced in the court below.

*Affirmed.*

KIMBALL, C. J., AND RINER, J., concur.