THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
KURT BARTH, PLAINTIFF IN ERROR.

Argued October 5, 1934—Decided January 10, 1935.

For the plaintiff in error, *Samuel I. Kessler* and *James
James L. McKenna.*

For the state, *William A. Wachenfeld,* prosecutor of the
pleas, and *Joseph E. Conlon,* first assistant prosecutor.

The opinion of the court was delivered by

PARKER, J. The plaintiff in error was convicted of mur-
der in the first degree without recommendation of life
imprisonment, and brings this writ of error. That he was
guilty of murder in the first degree was frankly admitted on
the argument. Indeed, the defendant tendered a plea of
guilty at the outset of the trial. As a common law plea of
guilty it could not be accepted, the statute forbidding that
course. As a plea of *non vult,* the court in its discretion
could accept it, the punishment in such case being imprison-

ment for life, or as for murder in the second degree. *Pamph. L.* 1917, *p.* 801; *Cum. Supp. Comp. Stat.* 1924, *p.* 857. The trial court, on objection by the prosecutor, refused to accept the plea. We are informed in the brief of his counsel that "the defense offered no defense in bar, but took the stand and freely and frankly confessed the details of the crime." This may not be absolutely correct, but it does not require detailed analysis. One thing was quite clear: that the defendant sought to avert capital punishment; and to that end the evidence for defendant was mainly directed, in an attempt to obtain from the jury a recommendation of life imprisonment, which by the statute would be controlling on the court. Crimes act, section 108, as amended by *Pamph. L.* 1919, *p.* 303. The defendant testified (without objection by the state), to his sorrow and remorse, on realizing that he had killed a man; and the first group of assignments of error and specifications for reversal relates to the cross-examination of the defendant on this phase of the case. Defendant further undertook to testify to various details of his younger life and rearing, many of which the court excluded, and the second group of assignments and specifications relates to rulings on this line of testimony. Finally, the court, in response to a question from the jury, instructed them on the powers and duties of the Court of Pardons, and that instruction is challenged as erroneous.

The circumstances of the crime are short and simple. On April 6th, 1934, defendant entered the store of deceased Julius Friedman at Bloomfield and attempted a holdup at the muzzle of a revolver in the manner now familiar. There was a struggle, in the course of which Friedman was fatally shot, dying almost at once. Defendant fled without getting any money, but none the less his crime was murder in the first degree. Crimes act, section 107. *Pamph. L.* 1917, *p.* 801, *supra.*

On direct examination defendant testified that after going home he "was broken down, feeling terrible about the whole thing;" and that he told one of the police officers he was glad to get it off his chest, to let it come out, that he was

responsible for it, and that he was sorry it all happened. He said he got the pistol by mail order from Wisconsin, to take the place of one that he used to play with around the house and which was lost. Another and smaller revolver was in evidence, and this he said he had bought for $5 "from a fellow in the saloon" for no reason except that he liked to play with them. Still on direct, he gave a similar explanation of a set of brass knuckles: testified to taking out driver's licenses under a false name because he was on probation for stealing a car; and charged some stolen license plates against some associates, who borrowed the stolen car that he was using. Cross-examined, he admitted the Wisconsin revolver had been ordered in his sister's name; that he had filed the number off it; that the smaller gun he had gotten from a girl. He repeated his assurances of remorse, "felt bad, but I couldn't do nothing about it." He flatly denied having carried either the Wisconsin gun or the smaller gun after the homicide, and was then asked: "Q. On the 12th day of April, six days after you killed Friedman, did you go to a gas station in Cedar Grove?" (Objected to and allowed.) "A. Yes. Q. Did you stick that station up?" (Objected to and allowed.) "A. Why, yes, I was with Stanley." Over objection he testified that Stanley had then used the gun that killed Friedman, defendant being with Stanley and having given him the gun that same night, to use in the stickup.

"Q. All this time you felt terribly about having killed Friedman, didn't you? A. Well, I did, but I needed money bad enough."

The cross-examiner went on to elicit admissions that defendant, with one of the guns, had participated in a holdup of a store in Dover on April 24th; of a store in Bergenfield on April 27th; and with or without a gun himself, of a delicatessen store in Hackensack also on April 27th, and another in Bloomfield, April 28th. He admitted changing license plates on the car. All this was over objections and exceptions. The argument now is that proof of these later and disconnected crimes was improper; and that as defendant

had at first denied using the gun after the Friedman murder, that answer closed the legal cross-examination on that point. As to this last, we had never understood that a witness giving a wrong answer on cross-examination—in this case, apparently a false one—may not be further questioned with the results of eliciting the true answer; subject of course to the discretionary control of the court. The proof—on cross-examination, be it remembered—of other later and disconnected crimes, was directly relevant to the question which defendant sought and seeks to make what he calls an "issue" in the case, raised by defendant himself, to wit, that though guilty of murder in the first degree, the jury should save him from capital punishment because of his repentance and remorse. It was not a legitimate issue, for reasons presently to be stated; but the testimony having come in without objection, the state, on the natural theory that the genuineness of the defendant's repentance and remorse was to be tested by its fruits, was entitled to argue that "remorse" accompanied by five subsequent and successive holdups in about three weeks, was a hollow sham, and to cross-examine on that theory. No question of rebutting defendant's testimony is involved, as the state closed without any rebuttal. We find no error here.

The next group of assignments and specifications relates to the exclusion by the court of "evidence offered by the defendant, relating to the defendant's past life and his antecedent background." We quote the language of the brief. There were a number of questions, which need not be reproduced, relating to details of family life, some addressed to the defendant himself, some to his father, some to his sister and perhaps others, and bearing on such subjects as the reading of detective stories, listening to stories of the great war, playing of games involving the handling of firearms, and the like. These the court excluded, and in our judgment quite properly. The argument for plaintiff in error seems to be, in substance as before, that as the jury in case of a finding of guilty was then to consider and decide whether defendant's life should be spared by a recommendation, the pro-

priety of such recommendation became an "issue" in the case to be determined "upon and after consideration of all the evidence" (*Pamph. L.* 1919, *p.* 303), and that evidence "relating to defendant's past life and antecedent background" was relevant and material on that "issue." Going one step further, the evidence offered necessarily was aimed at showing that defendant in his family life had been habituated to an atmosphere of violence, firearms and crime, and being so habituated, should not be put to death for committing murder in the attempted perpetration of a robbery. The necessary result of such reasoning is that the worse the early training, the stronger the argument for a recommendation of mercy; and the professional gangster reared and schooled in crime, perhaps convicted of crime a dozen times previously, should be spared because of an unfortunate early training, where others, more tenderly reared, go to the electric chair. Doubtless such matters are considered in sentencing for crimes and in connection with the parole system and the work of the Court of Pardons; but they are not relevant at the trial. As a matter of precedent, in *State* v. *James,* 96 *N. J. L.* 132, cited and relied on by plaintiff in error, this court limited the phrase "all the evidence" to mean "all the evidence adduced between the state and the prisoner on the issue of guilt or innocence." Evidence about "past life and antecedent background" may be offered to the Court of Pardons, but is out of place in a trial for crime. The crime itself, and the circumstances under which it was committed, form the criterion for a recommendation *vel non* by the trial jury. The evidence was properly excluded.

The last main point attacks the instruction of the court in reply to a question from the jury. They had been charged, had retired, and later returned into court. What then occurred is best exhibited by reproduction of the colloquy that ensued: "The court—Mr. Foreman and gentlemen. You have an inquiry to address to the court? Will you indicate to the court what it is in substance now and the court will be glad to answer it if it can? Just state what it is. The foreman—We would like to know whether life imprison-

ment really means life imprisonment? The court—You mean by that whether or not there is authority in any court to modify that? The foreman—Yes, sir. The court—Well, the court charges you gentlemen in respect to that, there is the Court of Pardons, a court constitutionally constituted—I mean by that, provided for by our constitution. That Court of Pardons has power to modify, change, reduce, abolish or set aside whatever result the jury may arrive at, whether they fix the penalty of death or life imprisonment. It is a power resident in that court to do that regardless of the penalty, and that court is constitutionally established. Does that answer your question? The foreman—Yes, sir. The court—Is there anything else, gentlemen? That is all? The foreman—Yes, sir. The court—You may retire."

The exception taken and sealed was "to [the court] referring on any matter to the Court of Pardons, the powers of the Court of Pardons."

The point is attempted to be raised by the fifty-ninth and sixtieth assignments and specifications, which are identical in substance. They are technically faulty as not reproducing the language used by the court (*State* v. *Blaine*, 104 *N. J. L.* 325), but in a capital case may well be treated on the merits. The instruction was plainly responsive to the inquiry: and differs in no substantial way from the language approved in *State* v. *Carrigan*, 93 *Id.* 268; 94 *Id.* 566; *State* v. *Schilling*, 95 *Id.* 145, 154; *State* v. *Rombolo*, 89 *Id.* 565, 569, and *State* v. *Mosley*, 102 *Id.* 94, 105.

The judgment is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, HEHER, PERSKIE, VAN BUS-KIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 13.

*For reversal*—None.