THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LE ROY WHITE, DEFENDANT-APPELLANT, AND
ROBERT TOURSE, DEFENDANT.

Argued March 17, 1958—Decided May 26, 1958.

*Mr. Ervan F. Kushner* argued the cause for defendant-appellant (*Messrs. Ervan F. Kushner* and *Sidney Adlman,* attorneys; *Mr. Ervan F. Kushner,* of counsel).

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for plaintiff-respondent (*Mr. Charles S. Joelson,* Deputy Attorney-General, Acting Passaic County Prosecutor, attorney; *Mr. Archibald Kreiger,* of counsel).

The opinion of the court was delivered by
WEINTRAUB, C. J. Robert Tourse and Le Roy White were convicted of murder in the first degree. Tourse was sentenced to life imprisonment upon the jury's recommendation and does not appeal. There was no recommendation for White, and he appeals from the judgment imposing the death penalty.

The homicide occurred in the course of a robbery on July 24, 1957. White freely admitted his role in the killing. He and Tourse planned the holdup. Tourse remained in

his automobile while White, armed with a revolver, entered the neighborhood grocery store of Joseph Klein. According to White, Mr. Klein, age 75, resisted, and to subdue his victim he struck him with his fist. However, the injuries, including a fracture of the skull, were such that the medical examiner inferred there were "blows to the head by blunt instrument." Mr. Klein died on the day of the attack.

## I.

White offered the defense of insanity.

The evidence would well warrant a finding that White was addicted to heroin, taking daily injections. According to White, the drug was effective for nine to ten hours, after which he experienced symptoms of withdrawal. The thesis of the defense was that the holdup was conceived and executed to acquire funds to purchase heroin to satisfy the imperative bodily demand for the drug in such withdrawal stage and hence defendant should be acquitted.

Two specialists in neurology and psychiatry testified for defendant. Dr. Robert S. Garber described the withdrawal symptoms typical of advanced addiction to heroin. During that stage, according to Dr. Garber, the "physical and emotional symptoms" increase to the point of desperation so that the addict's "ability to reason things through is not nearly as logical" and hence he is "quite ill mentally and emotionally." It "is probably true, that they labor under a defect of reasoning because of the physical and the emotional symptoms," and "My feeling is that he is less able" to know the quality of the act he is doing. He agreed, however, that White "is not insane in reference to the *M'Naghten* rule"; that he could distinguish right from wrong, but the withdrawal experience "made him emotionally ill to a degree that he couldn't help but color his ability to do this." He added that "I think he was able to form the intent to commit the robbery, principally because he was desperate enough."

Dr. Garber testified that drug addiction over a period of years may cause "a certain amount of mental deterioration." He did not suggest that any had here occurred. Nor was there testimony that White was "insane" in any sense as of the time of trial. Dr. Garber said that when the drug is administered "there's immediate relief of the symptoms and within a short period of time [he] returns to his normal behavior." It appeared that following his arrest, White was given phenobarbital four or five times a day for a period of three weeks because of his addiction.

Dr. James B. Spradley, for the defense, testified essentially to the same effect. He said that without the drug an addict such as White "was not able to function properly." Although the withdrawal "creates a very distressing and disturbing state of mind * * * it does not distort his orientation. He still knows where he is and what he is doing. His memory is not too badly affected," but "I don't think that any of the higher mental processes are evidenced to the same degree in the absence of the drug. Thinking, reasoning, judgment, restraint of activities; all of those functions of the brain are minimal" and "distorted." Although the addict knows what he is doing, "the demand for the drug is so great he cannot exercise judgment and restraint on his behavior to the same degree that a normal person could." He agreed that White "knew the difference between right and wrong," knew that what he did was wrong and a violation of the law, and was able to form the intent to rob, but "These people are no longer free agents. The need of the drug controls them."

We add that White's testimony, although descriptive of the painful withdrawal symptoms, reveals a clear appreciation and recollection of the crime. He recounted the planning and perpetration of the robbery and attack in detail.

Upon this record the trial court charged that voluntary use of narcotics will not excuse or justify a crime; that if such use results in a mental disease, the disease will receive the same recognition as insanity arising out of any other cause; and that where as here the claim is temporary

insanity, the issue is whether "the accused was laboring under a defect of reason as not to know the nature and quality of the act he was committing, or if he did know it, that he did not know what he was doing was wrong." Thus the issue went to the jury, in terms of the *M'Naghten* test applied to a temporary mental derangement.

Defendant urges the restless question whether the *M'Naghten* rule is a correct approach to the defense of insanity. We fail to see how this case presents the question. We say this because the competing tests all require some form of mental disease or defect and none appears in the record before us.

█ That *M'Naghten* requires a showing of mental disease is evident from the statement of its concept, that criminal culpability exists unless "at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that he was doing what was wrong." *Mackin v. State,* 59 *N. J. L.* 495, 497 (*E. & A.* 1896). The irresistible impulse *addendum* to (or perhaps interpretation of) *M'Naghten* likewise demands proof of mental disease, *Weihofen, Mental Disorder as a Criminal Defense* (1954), *p.* 91; 1 *Burdick, Law of Crime* (1946), § 213, *p.* 284; see *passim, Annotations,* 70 *A. L. R.* 659 (1931) and 173 *A. L. R.* 391 (1948), a distinction being drawn between an irresistible impulse and an impulse that just was not resisted. And so also does the New Hampshire rule, recently catapulted into prominence by *Durham v. United States,* 94 *U. S. App. D. C.* 228, 214 *F. 2d* 862, 875 (*D. C. Cir.* 1954), annotated in 45 *A. L. R. 2d* 1447 (1956), which would lead to an acquittal when the "unlawful act was the product of mental disease or mental defect."

Although the terms mental disease and mental defect in the irresistible impulse and *Durham* tests themselves call for definition, we see no expansive view of them which would embrace this case. Defendant's psychiatrists do not find any mental illness because of or independent of the use

of drugs. At best, we have a case in which drugs were voluntarily taken and in which defendant again had free choice (in the sense of the absence of impairment by disease or disorder of the mind) to turn himself in for treatment at all times when by virtue of the taking of drugs his behavior was restored to "normal" (to use the psychiatrist's term). Defense counsel were unable to find any authority which would equate the bodily demand for drugs during withdrawal to an insane compulsion which excuses. Nor have we found any unless it be *Prather v. Commonwealth*, 215 *Ky.* 714, 287 *S. W.* 559 (*Ct. App.* 1926), which dealt with a factual picture far more extreme and which in any event seems limited by *Millburn v. Commonwealth*, 223 *Ky.* 188, 3 *S. W. 2d* 204 (*Ct. App.* 1928).

The general rule is that the voluntary use of drugs, like the voluntary use of alcohol, is not a defense to murder (in the absence of mental disease resulting therefrom), although in some situations it may be pertinent with respect to the degree of that crime by negating the existence of the specific intent to kill. 1 *Wharton, Criminal Law and Procedure* (12*th ed.* 1957), §§ 44–49, *pp.* 99–116; *Weihofen, supra, pp.* 124–29. Although voluntary intoxication is thus said not to be an excuse for crime, yet substantial authority supports the view that it may lead to an acquittal when it excludes a required specific intent for the reason that in such circumstances the defendant did not commit the crime charged. *Weihofen, supra, p.* 179; 1 *Wharton, supra,* § 44, *p.* 102; see *Warner v. State,* 56 *N. J. L.* 686, 690 (*E. & A.* 1894).

Our cases hold that voluntary intoxication is no defense to murder, but where the State's thesis is that the killing was willful, deliberate and premeditated, intoxication which so prostrates the faculties as to prevent the formation of the specific intent to kill, will hold the crime to murder in the second degree. *State v. Wolak,* 26 *N. J.* 464, 477 (1958); *State v. Tansimore,* 3 *N. J.* 516, 528 (1950); *State v. Treficanto,* 106 *N. J. L.* 344, 352 (*E. & A.* 1929); *State v. Mangano,* 77 *N. J. L.* 544, 549 (*E. & A.* 1909); *Wilson*

*v. State,* 60 *N. J. L.* 171, 184 (*E. & A.* 1897); *Warner v. State, supra,* 56 *N. J. L.* at *page* 689. The same rule was applied with respect to the influence of narcotics in *State v. Close,* 106 *N. J. L.* 321 (*E. & A.* 1930).

In *State v. Roach,* 119 *N. J. L.* 488, 490 (*E. & A.* 1938), it was held with respect to felony murder that "In the absence of the interposition of a plea of insanity the state of mind of the defendant was not in issue. Intoxication in such case is not a defense and cannot reduce the crime from first to second degree." Two judges disagreed. In *State v. Burrell,* 120 *N. J. L.* 277 (*E. & A.* 1938), also involving a felony murder, the trial court charged first degree or acquittal. Defendant complained that a lesser degree of murder was not left as an alternative. That failure seems to have been approved inferentially. And as to the instruction that there be an acquittal if intoxication precluded formation of an intent to rob or burglarize, the court said (120 *N. J. L.* at *page* 285) :

> "This was, if anything, too favorable to the defendants. In *State v. Marriner,* 93 *N. J. L.* 273, affirmed 95 *N. J. L.* 265, it was specifically held that 'mental unsoundness produced by intoxication, even where it is so pronounced as to exhibit an entire prostration of the faculties of the defendant, is no defense against a criminal charge.' "

On the other hand, in *State v. Tune,* 17 *N. J.* 100 (1954), *certiorari* denied, 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955), also a felony murder case, the trial judge charged at defendant's request that intoxication could be considered on the issue of intent to rob and if that intent should not be found the verdict could not be more than murder in the second degree. That instruction was approved as against objections which did not flag the issue here discussed. No reference was made to *Roach* or *Burrell.*

Here the trial court directed the jury to consider the evidence offered as to insanity in determining whether there existed the specific intent to rob and directed an acquittal if that intent was not found. This seems to have comported

with defendant's request to charge. Thus the trial court permitted the jury to consider temporary insanity on the basis of voluntary use of drugs. Presumably he did so on the strength of *State v. Lynch*, 130 *N. J. L.* 253 (*E. & A.* 1943). There the plea was "a total amnesia" as to which evidence was offered that for two or three years defendant "had suffered from chronic bromide poisoning, and that this condition became acute prior to the shooting as a result of the taking of a large quantity of bromides." (130 *N. J. L.* at *page* 255). It was held to be error in those circumstances to charge that the insanity which the law recognizes must be a fixed and continuous condition. *Lynch* involved a charge of willful, deliberate and premeditated killing, and not a felony murder.

The question whether defendant was entitled to the charge here given on the issue of insanity was not raised or argued and hence we express no view. It is enough to say that from the foregoing review of our cases, however discordant they may seem, defendant surely cannot complain, and especially in the light of his testimony that he knowingly planned and committed the holdup and the opinion of the defense psychiatrists that he did formulate the intent to rob. What defendant wanted was an instruction in terms of the *Durham* rule and, as we have said, the proofs in any event would not come within that doctrine.

Of course, a very different question is whether drug addiction may be considered by the jury with respect to punishment. Whether a defendant should live or die does not depend upon legal principles concerning guilt. Rather it calls for a moral judgment in which mental illness or aberrations, rejected by the jury as a defense, may nonetheless weigh heavily. Here the evidence was in fact admitted and was not removed from the jury's consideration of whether to recommend life imprisonment.

## II.

The questioning of Tourse led to White and he was apprehended. White was interrogated by a member of the staff

of the Deputy Attorney-General assigned to handle the criminal business of the county. A confession was taken stenographically under oath. White declined to sign the transcribed statement until he could obtain the advice of counsel, although he orally acknowledged the contents to be true. It was never signed. The confession was admitted into evidence over objections we shall now consider.

Defendant urges the confession was vitiated by the fact that an oath was administered. The issue seems not to have arisen heretofore in this State. Elsewhere some early authorities support defendant's position. They apparently found the exclusion to be a corollary of the rule then prevailing that a defendant was not a competent witness, rather than to rest upon the basis that the oath rendered the confession involuntary. The general view today is that a confession is admissible notwithstanding the administration of an oath. 2 *Underhill, Criminal Evidence* (5th ed. 1956), § 396, p. 1012; 2 *Wharton, Criminal Evidence* (12th ed. 1955), § 364, p. 77; 20 *Am. Jur., Evidence*, § 527, p. 450; 22 *C. J. S. Criminal Law* § 832, p. 1455.

An involuntary confession is one thing, and compelling a man to testify against himself is another, 8 *Wigmore, Evidence* (3d ed. 1940), § 2266, p. 387, although both may converge in some cases. The usual basis for invalidating a confession improperly induced is its untrustworthiness. 3 *Wigmore, supra,* § 822, p. 246. Thus viewed, the compulsion of an oath to tell the truth hardly comes within the reason for the confessional rule. We turn therefore to the other phase of the inquiry, whether the privilege against self-incrimination was violated.

*N. J. S.* 2A:81–8 provides that "On the trial of an indictment, the defendant shall be admitted to testify, if he offers himself as a witness." *N. J. S.* 2A:81–5, provides that "No witness shall be compelled to answer any question if the answer will expose him to a criminal prosecution or penalty or to a forfeiture of his estate." See also *N. J. S.* 2A:81–6. The common law rule against self-incrimination is not embodied in the Constitution of our State, but the

statutory safeguard is no less urgent and protective. *State v. Fary,* 19 *N. J.* 431 (1955).

██ It may be that neither of the quoted statutes is applicable for the reason that the interrogation was not in a proceeding within their meaning. 8 *Wigmore, supra,* § 2252, *p.* 320; *cf. Laba v. Board of Education of Newark,* 23 *N. J.* 364, 390 (1957). The interrogation occurred in the course of a police investigation. But the principle of fair play from which these statutes emerged must range beyond the courtroom; otherwise the privilege could be nullified. If enforcement officials simulated a judicial proceeding and persuaded a defendant he must testify upon some penalty for a refusal, an invasion of the rights of the individual might well be found.

██ Such, however, is not the case before us. Defendant did not suggest he believed he was compelled to answer under pain of punishment, lawful or unlawful. The statement itself would plainly dispose of any such claim if it were made. After inquiries as to defendant's full name, address, nickname, whether defendant remembered the events of July 24 and the hour at which he arose on that day, the statement reads:

"Q. Let me ask you at this point: Are you willing to give me a completely voluntary statement regarding the events of Wednesday, July 24, 1957? A. Yes.

Q. Are you doing so without any threats or promises on my part or on the part of anyone? A. That's right.

Q. In other words, have I or has anyone threatened you? A. No.

Q. Have I or has anyone promised you anything for this statement? A. No."

In these circumstances, there is no basis for the contention that the confession was involuntary or procured in violation of any right of defendant.

██ We add that *R. S.* 41:2–3.1, which authorizes county detectives and investigators of the prosecutor's office to administer oaths in relation to matters involving a violation or an attempted violation of the criminal laws of this State, does not empower the prosecutor to compel testimony. *State*

*v. Eisenstein,* 16 *N. J. Super.* 8, ·13 (*App. Div.* 1951), affirmed, 9 *N. J.* 347 (1952).

██ Defendant also complains of the absence of a warning that he was free not to speak and that what he said might be used against him. He relies upon *R. R.* 3:2–3, which deals with proceedings before a magistrate upon preliminary hearing and provides in subparagraph (b) that the magistrate "shall * * * inform the defendant of his right to make a statement not under oath as to the charge against him, that he is not required to make such a statement and that any statement made by him may be used against him." The rule governs proceedings before a magistrate. It was not designed to regulate the conduct of executive officers, nor to prescribe by implication any rule of evidence applicable to confessions given to them. See *People v. Randazzio,* 194 *N. Y.* 147, 87 *N. E.* 112 (*Ct. App.* 1909). A failure to warn is not *per se* a bar to admissibility. *State v. Wise,* 19 *N. J.* 59, 99 (1955); *State v. Pierce,* 4 *N. J.* 252, 261 (1950); *cf. State v. Fary, supra,* 19 *N. J.* at *page* 435. We note that defendant must have been impressed with his right to refuse to give a statement by virtue of the inquiry made as to his willingness to give one, and it seems unlikely that he was unaware of the obvious, to wit, that a confession of murder would be usable against him.

## III.

██ The jury interrupted its deliberation to inquire:

"The question was brought up that in the event that first degree is life imprisonment, is there any possibility of time off for good behavior, or is it a fixed life sentence."

The trial judge replied:

"Well, on that question, members of the jury, I merely want to advise you as follows. I am quoting from the statute law of New Jersey. Under the statute there is created and established within the Department of Institutions and Agencies a State Parole Board, and also under the statute it provides that it shall be the duty of

the board to determine when and under what conditions, subject to the provisions of this act, persons now or hereafter serving sentences having fixed minimum and maximum terms or serving sentences for life, in the several penal and correctional institutions of this State may be released upon parole.

The statute further provides:

'When the board has been furnished all existing available records pertaining to the prisoner it shall consider the merits of his parole and shall make such other investigation as it shall deem necessary and proper.'

And then the further statute provides, and I think this is probably the one with which you are most concerned, from your question,

'Any prisoner serving a sentence of life shall be eligible for consideration for release on parole after having served twenty-five years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments.' "

Defendant objected "that it is not within the province of the court to instruct the jury as to what might happen in life." The issue is whether the trial court properly dealt with the jury's inquiry.

In *State v. Roscus,* 16 *N. J.* 415 (1954), the trial court received a like inquiry and made virtually the same reply. There defense counsel expressed approval and for that reason the court concluded (16 *N. J.* at *page* 429) the "objection to the charge was not properly raised as required under *R. R.* 3:7–7(b)," but it did add that "in addition such instruction was proper, *State v. Molnar,* 133 *N. J. L.* 327, 336 (*E. & A.* 1945)." It should be noted, however, that in *Roscus* the question whether the charge was an adequate statement of the provisions of the parole statute was not raised or argued, and the question whether the jury should consider the subject at all was not presented with the full historical background and with the references to practice elsewhere which are discussed hereinafter.

It should be stated frankly that the trial judge handled the situation in accordance with prior decisions. However, upon a re-appraisal of the problem, we cannot escape the conclusion that the course heretofore approved is erroneous.

Defendant correctly points out that the charge was incomplete in any event. No reference was made to the provision of the 1948 Parole Act, *N. J. S. A.* 30:4-123.14:

"No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned while under sentence, but only if the board is of the opinion that there is reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society."

Nor did the charge disclose that a parolee may be returned to prison for violation of parole.

But we prefer to deal with the basic question whether a jury may consider the matter at all. The holding that it may has evoked strong dissent in this State and has little support elsewhere. The authorities preponderate heavily the other way. See *Annotation,* 35 *A. L. R.* 2d 769 (1954), and later decisions not there considered. *Lawley v. State,* 264 *Ala.* 283, 87 *So.* 2d 433 (*Sup. Ct.* 1956); *Scarber v. State,* 226 *Ark.* 503, 291 *S. W.* 2d 241 (*Sup. Ct.* 1956); *McGruder v. State,* 213 *Ga.* 259, 98 *S. E.* 2d 564 (*Sup. Ct.* 1957); *Deming v. State,* 235 *Ind.* 282, 133 *N. E.* 2d 51 (*Sup. Ct.* 1956); *State v. Conner,* 241 *N. C.* 468, 85 *S. E.* 2d 584 (*Sup. Ct.* 1955); *cf. State v. Meyer,* 163 *Ohio St.* 279, 126 *N. E.* 2d 585 (*Sup. Ct.* 1955); *contra: People v. Riser,* 47 *Cal.* 2d 566, 305 *P.* 2d 1 (*Sup. Ct.* 1956), *certiorari* denied 353 *U. S.* 930, 77 *S. Ct.* 721, 1 *L. Ed.* 2d 724 (1957); *cf. Phillips v. State,* 92 *So.* 2d 627 (*Fla. Sup. Ct.* 1957). So also, suggestions by the prosecution that a conviction may be reviewed by appeal and a sentence disturbed by executive clemency were held to require reversal in *People v. Johnson,* 284 *N. Y.* 182, 30 *N. E.* 2d 465, 132 *A. L. R.* 675 (*Ct. App.* 1940). See *Broyles v. Commonwealth,* 267 *S. W.* 2d 73, 47 *A. L. R.* 2d 1252 (*Ky. Ct. App.* 1954); *Graham v. State,* 304 *S. W.* 2d 622 (*Tenn. Sup. Ct.* 1957); *Annotation,* 95 *A. L. R.* 566 (1935).

Frequently punishment is the only real issue in a homicide trial. In fact, despite the plea of insanity, counsel for

defendant realistically devoted his summation to the subject of punishment. Our prior decisions being contrary to the general trend, we should not hesitate to consider again whether we are executing the legislative will.

Prior to 1916 the jury was not concerned with the sentence for murder. In that year *chapter* 270 was enacted. It provided:

"Every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death unless the jury at the time of rendering the verdict in such case shall recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed. * * *"

Governor Fielder had vetoed the bill, saying:

"I feel constrained to withhold my approval because I do not believe you have taken into consideration chapter 214 of the laws of 1914, which provides that anyone sentenced for the term of his natural life and who has served fifteen years, may be released on parole by the Board of Prison Inspectors. If a man is convicted of murder in the first degree, but in the opinion of the jury he should be sentenced to hard labor for life, rather than be executed, there should be no possibility of shortening the life sentence, except through the Constitutional power of the Court of Pardons."

The Legislature overrode the veto.

The statute was a compromise on the issue whether capital punishment should be abolished. It was foreshadowed by the report to the Senate in 1908 of the Committee to Inquire into the Subject of Capital Punishment, which concluded with a recommendation along the line of the 1916 act.

In *State v. Rombolo,* 89 *N. J. L.* 565 (*E. & A.* 1916), the jury was informed, in response to its inquiry, that a defendant convicted with a recommendation could be pardoned. The Court of Errors and Appeals affirmed, saying that "Naturally one of the elements to be considered by them in determining that punishment is whether, if they shall by their verdict impose life imprisonment, it can be disregarded and set at naught by the court of pardons" (89 *N. J. L.* at *page* 570). In *State v. Martin,* 92 *N. J. L.*

436 (*E. & A.* 1919), in which the immediate question was not involved, the court divided 8 to 6 on the broader issue, whether the jury may go beyond the evidence in dealing with the sentence. The majority thought the recommendation was not part of the verdict and was not a finding upon the evidence, and could rest upon any consideration in the jury's discretion. They reversed, however, because "the court had no power to instruct the jury as to the effect of the evidence upon the question of recommendation, and no one reading this charge can escape the conclusion that the purpose of the trial court was to influence the jury against recommending imprisonment for life because of the enormity of the crime as he pictured it to the jury." (92 *N. J. L.* at *page* 443).

Eight days after *Martin* was decided, *Assembly No.* 370 was introduced to amend the 1916 statute. The changes accomplished are revealed in the committee substitute for the bill which reads:

"Every person convicted of murder in the first degree, his aiders, abettors, counsellors and procurers, shall suffer death unless the jury [at the time of rendering the verdict in such case] *shall by their verdict, and as a part thereof, upon and after consideration of all the evidence,* recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed; * * *."

Appended thereto was a Statement here printed in the margin.[1] The measure was adopted and now appears as *N. J. S.* 2*A*:113–4.

STATEMENT[1]

"The object of this bill is to meet this situation.

In the *Rambola* [*Rombolo*] case, 99 *A.* .[at] *page* 434, the Court of Errors and Appeals in discussing this act of 1916, *page* 576, says:

'By force of this legislation, however, an additional burden is put upon the jurors in case they shall adjudge the defendant to be guilty of murder of the first degree, and that is to determine, within the limits fixed by the statute, what his punishment shall be. Naturally, one of the elements to be considered by them in determining that punishment is, whether, if they shall by their verdict, impose imprisonment, it can be disregarded and set at naught by the Court of Pardons.'

The effect of the 1919 amendment was (1) to make the recommendation part of the verdict and (2) to require the recommendation to be made "upon and after consideration of all the evidence." In setting forth the "situation" which the bill was designed to meet, the Statement quoted the very portion of *Rombolo* with which we are here concerned. Thus there is strong evidence of a legislative purpose to exclude consideration of the pardoning or parole power, evidence which appears not to have been expressly noted in any subsequent decision.

In *State v. Carrigan,* 93 *N. J. L.* 268 (*Sup. Ct.* 1919), which was tried before the 1919 amendment, it was held on the strength of *Rombolo* that the trial judge properly charged on its own initiative that consideration could be given to the power of the Court of Pardons and as well to the statute authorizing parole after 15 years' imprisonment. The Court of Errors and Appeals affirmed 7 to 4. 94 *N. J. L.* 566 (1920).

---

In the *Martin* case, etc., March 3, 1919, the Court of Errors and Appeals, in construing this same statute of 1916, says:

'The statute does not make it a part of the verdict, for the verdict determines the question of the guilt or innocence of the accused, and that must be arrived at and be a verdict of murder of the first degree before the question of recommendation arises, which is a distinct matter, for the jury may agree on a verdict that the defendant is guilty of murder of the first degree, but not be able to' agree to a recommendation. While a jury may be influenced to recommend life imprisonment as a punishment by the very matters which evidenced the guilt of the accused, and properly so, still, in law, the jury are not bound to consider such evidence to determine whether to make or refuse a recommendation.'

In the *Rambola* [*Rombolo*] case, the Court of Errors said:

'If they shall, by their verdict, impose life imprisonment,' seeming thereby to hold that the recommendation was a part of the verdict.

In the *Martin* case, it is distinctly held that the recommendation is not a part of the verdict.

In the *Martin* case, the Court holds that, under the language of the Act of 1916, the jury are not bound to consider the evidence in determining whether to make or refuse a recommendation. The purpose of this is to make it clear that the recommendation is a part of the verdict, and that in determining whether or not the recommendation shall be made, the jury shall consider all the evidence in the case."

In the second *Martin* case, 94 *N. J. L.* 139 (*E. & A.* 1920), which was tried after the 1919 amendment, the trial judge charged with respect to the pardoning power. The appellate court affirmed, but said (94 *N. J. L.* at *page* 143):

"We think this remark was unfortunate, but we cannot say that the judge committed legal error, or went beyond his right of comment. Nor can we say that harm was done to the prisoner. The remarks of the judge were quite unnecessary, since we suppose that every juryman must know of the existence of the court of pardons, and that it might change the result of their verdict by exercising mercy or grace."

In *State v. Schilling*, 95 *N. J. L.* 145 (*E. & A.* 1920), a like instruction was sustained, the court stating *Rombolo* continued to be good law notwithstanding the 1919 amendment and adding that the charge was "not harmful to the defendant, nor error in law, when, as in this case, it was applied to any verdict the jury might return." (95 *N. J. L.* at *page* 154). In *State v. Mosley*, 102 *N. J. L.* 94 (*E. & A.* 1925), there was a similar charge. The majority noted the observation in the second *Martin* case that the remark was unfortunate but not harmful. Six judges dissented. Two dissents were filed. One dealt with the present issue and in part concluded that the 1919 amendment had eliminated *Rombolo*. (102 *N. J. L.* at *page* 117).

In *State v. Barth*, 114 *N. J. L.* 112 (*E. & A.* 1935), and *State v. Dworecki*, 124 *N. J. L.* 219 (*E. & A.* 1940), the charge was sustained unanimously. In *State v. Leaks*, 126 *N. J. L.* 115 (*E. & A.* 1941), the majority opinion was silent on this question, but four members of the court dissented, saying that the trial court should not have volunteered to charge on the subject and "The jury has nothing whatever to do with whether the convicted person may appeal or may seek clemency in other courts." (126 *N. J. L.* at *page* 119). In *State v. Molnar*, 133 *N. J. L.* 327 (*E. & A.* 1945), the majority sustained a like charge given in response to the jury's question. Four judges dissented on other grounds.

The foregoing reveals how what was once declared to be "unfortunate" and "unnecessary" but not legally incorrect

and "harmless" became a fixed course. We agree the charge is "unfortunate." For reasons to be stated, we cannot subscribe to the view that it is a proper charge. And assuming it to be improper, we cannot agree the error is harmless, for if a jury, doubtful as to whether the penalty should be death or satisfied that it should be life imprisonment, should withhold a recommendation because the death sentence may be commuted or because another agency may grant parole on a life sentence, it is difficult to comprehend how it can be maintained that there is no harm to a defendant.

The question whether a sentence shall be immutable involves deep policy considerations. The *Constitution of 1947* itself answers the question. It provides that the Governor may grant pardons and reprieves in all cases other than impeachment and treason. *Art. V, Sec. II, par. 1.* It directs that a system for the granting of parole shall be provided by law. *Art. V, Sec. II, par. 2.* Evaluating the elements of justice to the individual, the interest of society in the redemption of men and as well the impact of imprisonment without hope upon the operation of penal institutions, the Legislature rejected the concept of an unalterable sentence for life and prescribed the terms and conditions upon which a prisoner so sentenced may be paroled. It will be recalled that the Legislature disagreed with Governor Fielder's suggestion that the 1916 bill should have removed a life sentence from the jurisdiction of the then Board of Prison Inspectors.

The Legislature committed to the jury the responsibility to determine in the first instance whether punishment should be life or death. It charged another agency with the responsibility of deciding how a life sentence shall be executed. The jurors perform their task completely when they decide the matter assigned to them upon the evidence before them. What happens thereafter is no concern of theirs. It is no more proper for a jury to conclude that death be the penalty because a life sentence may be commuted or the defendant paroled, than it would be for a trial judge in other criminal

causes deliberately to impose an excessive sentence to frustrate the statutory scheme committing parole to another agency.

That death should be inflicted when a life sentence is appropriate is an abhorrent thought. We should not attribute that purpose to the Legislature. The Legislature could not have intended that juries shall weigh the death penalty against something less than a life sentence and by that process arrive at a punishment which does not fit the facts. To overcome a judicial misconception of its original purpose, it spelled out in the 1919 amendment that that decision shall be made upon the evidence in the case and upon nothing else. Had it intended a different course, the Legislature would have authorized a third alternative, an immutable sentence for life. It did not so provide, not because it wanted the death penalty to be unjustly inflicted, but because it believed it to be beyond the talent of any one to anticipate whether future circumstances will warrant amelioration of the life sentence.

We have no doubt that *Rombolo* misconceived the legislative will and that the 1919 amendment was designed to correct that judicial error. We conclude, therefore, that *Rombolo* and the other cases cited above must be overruled insofar as inconsistent with the view here expressed.

The practical problem is how to fulfill the legislative will that so far as the jury is concerned a death sentence is a death sentence and a life sentence is a life sentence. Doubtless most jurors have read of the parole of men sentenced for life. If an inquiry from the jury indicates this knowledge is playing a role in the deliberations, a mere refusal to answer would not eliminate the possibility of a miscarriage. Logically, the jury should be told simply that the subject of parole must not be considered by it. But the efficacy in fact of an instruction to that effect is questionable and since there may reside in the jurors' minds varying understandings of the basis of parole, including what seems to be a popular belief, that the passage of time alone suffices to entitle a prisoner to release, the jury may as well be informed of the true basis of parole. Hence the question

should be answered, but followed by a direction to exclude the subject from consideration. The instruction should be in essence as follows:

"Any prisoner serving a sentence of life is eligible for consideration for release on parole after having served 25 years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments. The statute provides that no prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned to him, but only if the State Parole Board is of the opinion that there is reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society. A prisoner released on parole remains on parole for the balance of his life and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

I have answered your question, but instruct you that the subject of possible parole must be excluded from your deliberations. You may not speculate as to whether parole would or would not be granted. So far as you are concerned, a life sentence is a life sentence. If upon and after consideration of all the evidence you believe a recommendation for imprisonment for life should be made part of your verdict, it would be a violation of your duty to refuse to make that recommendation because of the existence in another authority of the power and responsibility with respect to parole."

For this reason, the judgment must be reversed and the matter remanded.

## IV.

 Defendant complains of the refusal of the trial court to charge (1) that the jury may consider the evidence offered on the issue of insanity in its deliberations upon punishment, and (2) that a recommendation may be based upon the lack of evidence.

With respect to the first proposition, the trial judge directed the jury to consider all the evidence in the case, using the language of the statute. As stated above, counsel for defendant devoted his entire summation to the question of punishment and relied heavily upon the proof offered on the issue of insanity. Nothing in the court's charge intimated

that this course was improper. Nor did any inquiry from the jury suggest any uncertainty.

In *State v. Molnar, supra,* 133 *N. J. L.* 327, a majority of the court held a defendant is not entitled to a charge directing the jury's attention to any particular portion of the .evidence with respect to its consideration of a recommendation. Defendant urges that the purpose of the request is not to emphasize any portion of the proof, but to avoid a likely misapprehension on the part of the jury that if it concludes that the defense of insanity has not been established, that portion of the evidence is to be disregarded in the subsequent deliberations as to punishment. We think there is a reasonable basis for this fear and although we believe it to be sound in general to leave the issue of the penalty to the jury without comment either way, yet with respect to the issue of insanity a request to charge which would obviate the possible misunderstanding we have described should be granted.

▓▓ With respect to the second proposition, that the lack of evidence may support a recommendation, defendant would transplant into this area a portion of the instruction on reasonable doubt applicable to the issue of guilt. *State v. De Paola,* 5 *N. J.* 1 (1950). It is probable that a lingering doubt as to guilt would in fact be reflected in the decision as to punishment and hence a defendant needs no instruction to that effect. On the other hand, to suggest to a jury that lack of evidence should be a factor as to punishment is to invite convictions notwithstanding a reasonable doubt as to guilt. The issue of guilt and the matter of penalty are distinct, and a confusion of the two in the manner proposed would be more mischievous than helpful to an accused.

It is unnecessary to consider the other questions raised upon this appeal.

For the reasons given, the judgment is reversed and the matter remanded for further proceedings not inconsistent with this opinion.

HEHER, J. (concurring in reversal). There are crucial questions of policy involved in the course to be taken by the trial judge when the jury inquires as to whether life imprisonment recommended under *R. S.* 2:138–4, upon a conviction of murder in the first degree, is subject to executive or administrative intervention by way of pardon, parole, or time off for good behavior. An instruction in the affirmative is fraught with grave danger of prejudice to the accused, even though accompanied by an unequivocal declaration that it has no place in determining whether the punishment shall be death or life imprisonment. And a refusal to respond to the inquiry may have some hazard, even though the utter irrelevancy of the subject matter is made clear to the jury. But the former is by far the greater peril, for the parole function would in that event be delineated in its essentials, and the jury would then be told to disregard it as entitled to no weight in fixing the penalty pursuant to the statute.

The information thus given could induce the withholding of the alternative penalty of life imprisonment, and it could induce a conviction. There can be no assurance of the individual juror's subjective reaction or against unwitting or subconscious adverse influence. As to punishment, the death penalty prevails unless the jury shall, by its verdict, recommend life imprisonment; and, to be effective, the recommendation must be the unanimous affirmative choice of the jury. *State v. Bunk,* 4 *N. J.* 461 (1950).

And there is every reason to believe that such was the intent and purpose of the current statute, the cases of *State v. Schilling,* 95 *N. J. L.* 145 (*E. & A.* 1920); *State v. Barth,* 114 *N. J. L.* 112 (*E. & A.* 1935); *State v. Leaks,* 126 *N. J. L.* 115 (*E. & A.* 1941); and *State v. Dworecki,* 124 *N. J. L.* 219 (*E. & A.* 1940), to the contrary notwithstanding. The amendment of 1919, *c.* 134, provides that one convicted of murder in the first degree shall suffer death unless the jury shall, "by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend" life imprisonment, and in that case "this and no greater punishment shall be imposed."

The history and the interpretation given the original act of 1916, c. 270, in *State v. Martin*, 92 *N. J. L.* 436 (*E. & A.* 1919), make clear the import and intent and the essential quality of the provision. The evidence in the case is to be considered; the pardon and parole potential plays no part in the inquiry. Under the original act, the jury were vested with an arbitrary discretion; under the amendment, *L.* 1919, c. 134, the current act, the jury exercise judgment and discretion based on the evidence. *State v. Cooper*, 2 *N. J.* 540 (1949). The Legislature obviously had in view circumstances in the particular case calling for a mitigation of the full rigor of the law, in the jury's sound discretion. But there is no occasion to pursue the inquiry. My views in this regard are given expression in the dissents in *State v. Molnar*, 133 *N. J. L.* 327, 337 (*E. & A.* 1945), and *State v. Bunk, supra,* and need not be restated here.

The general rule is that the jury should not be informed as to the law upon the subject of pardon and parole, and its request to that end should be denied. See, *e. g., People v. Barclay,* 40 *Cal.* 2d 146, 252 *P.* 2d 321 (*Sup. Ct.* 1953); *People v. Osborn,* 37 *Cal.* 2d 380, 231 *P.* 2d 850 (*Sup. Ct.* 1951); *Jones v. Commonwealth of Virginia,* 194 *Va.* 273, 72 *S. E.* 2d 693, 35 *A. L. R.* 2d 761 (*Sup. Ct. App.* 1952); *Strickland v. State,* 209 *Ga.* 65, 70 *S. E.* 2d 710 (*Sup. Ct.* 1952)—these among others collected in 35 *A. L. R.* 2d 769.

Accordingly, I would reverse the conviction and direct a new trial.

FRANCIS, J. (concurring). I concur in the opinion of the Chief Justice.

Under that opinion the case is going back for retrial. In my judgment, this circumstance makes it necessary to discuss the legal problem presented by the trial court's denial of the defendant's request to charge the jury in effect that the evidence adduced on the issue of insanity may be considered in deciding the matter of punishment. Those of my colleagues who joined in the majority opinion feel that

the particular question is not directly involved and accordingly they express no point of view thereon.

The request espouses the principle that any abnormal or subnormal mental condition of a defendant in a capital case, even though it may not satisfy the *M'Naghten* test of insanity, is admissible in evidence and is a proper subject of consideration by the jury in reaching a decision as to whether the death penalty should be imposed or imprisonment for life should be recommended. Such a rule is a just and humane one; it ought to be engrafted on the law of this state and the jury authorized to use it as a factor in the evaluation—not of guilt or innocence—but of life or death for the defendant.

A capital case is the only one in which, after a finding of guilt, the jurors sentence the defendant. They are told that if they return a verdict of murder in the first degree, the death penalty is mandatory, but that if they recommend imprisonment for life "no greater punishment shall be imposed." *N. J. S.* 2A:113-4. In dealing with every other type of criminal offense, a judge fixes the punishment (except in a few instances where the Legislature has established a mandatory minimum penalty). However, in no instance can a judge, no matter how long his experience in administering the criminal law or how vast his knowledge of human nature, sentence a defendant without first obtaining a pre-sentence report from the probation department of the county involved. *R. R.* 3:7-10(*b*). Such reports are prepared by men trained in the field of criminal responsibility. They range over the entire life of the offender—his religious training, education, environment, family life, work habits, medical history, if any, and the like—in an endeavor to bring to the mind of the court all of the elements pertinent to the degree of punishment and potentiality for rehabilitation. And if either the probation department or the judge feels that a psychiatric examination is desirable or may be helpful, it is ordered. On the basis of my own experience as a County Court judge, I do not believe that adequate or just sentences can be meted out without such investiga-

tions. The cited rule of this court recognizes the concept that in the administration of the criminal law, justice is served only by fitting the punishment to the offender as well as to the crime.

But in the one situation where, after a determination of guilt, the issue is life imprisonment or death, a jury of inexperienced laymen are required to reach a decision solely on the evidence of guilt or innocence of the homicide. That is our existing case law. *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Cordasco,* 2 *N. J.* 189 (1949); *State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945); *State v. Barth,* 114 *N. J. L.* 112 (*E. & A.* 1935); *State v. Favorito,* 115 *N. J. L.* 197 (*E. & A.* 1935); *State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909). I am convinced that such a doctrine disserves and misconceives the purpose of the statute.

The mental status or capacity or condition of an accused is an integral part of the act of killing. Although he may not escape a verdict of guilt because the disability of his mind does not reach the point of insanity within the legal definition, the ordinary dictates of a humane society demand that in the formulation of the moral judgment as to the degree of responsibility for purposes of punishment, the evidence of such disability or departure from the normal ought to be considered relevant and material. In deciding whether the killer should be put to death it is inconceivable that, under any modern system of law, a jury should be denied all knowledge of a mental disability, short of insanity, which operated as a motivating influence in the commission of the crime. At this point in the proceeding, guilt of the crime is no longer in question; the sole issue is punishment.

It has been suggested that mental deficiency appearing in the evidence, which did not wipe out the ability to distinguish between right and wrong and so was not a defense to the criminal charge, might well justify a jury in concluding that a recommendation of life imprisonment was warranted. See dissenting opinion, *State v. Molnar, supra,* 133 *N. J. L.* at *pages* 338, 339. And the majority opinion

in the present case indicates that such a course would be proper. But what if a motion is made by the State to strike such testimony from the record on the ground that it does not sustain the defense of insanity, as was done (and sustained) in *State v. Cordasco, supra,* 2 *N. J.* at *page* 195; or under the obvious implication of *State v. Wise, supra,* 19 *N. J.* at *page* 107? The possibility of that course being pursued on the retrial of this indictment impels me to express the views outlined herein.

Other jurisdictions have dealt with the precise problem. The Wyoming statute permits the jury in a capital case, whether on a plea of guilty or a trial, to "qualify their verdict by adding thereto, 'without capital punishment,'" *Rev. St.* 1931, § 32–201, in which event the sentence is required to be life imprisonment. In discussing its application, the Supreme Court said:

"Counsel for the defendant admit that in cases in which the trial judge imposes the punishment, without the aid of a jury, it is proper for him to inquire into the circumstances under which the crime was committed. * * * It may be that the same latitude should not be allowed when the jury fixes the penalty, which would be permissible when the trial judge does so, but it is quite apparent that the same reason for examining into the circumstances of the commission of the crime exists equally in both cases. While, as stated, the discretion of the jury to impose the penalty of death or life imprisonment is untrammeled, they cannot, in the very nature of things, bring in an intelligent verdict, unless they know the circumstances under which the crime was committed, and all the surrounding facts, including the age of the defendant, his intelligence, his mental condition at the time of the commission of the crime, and other relevant facts which might properly aid the jury in exercising their discretion. It is hardly credible that the statute contemplates that the jury shall exercise their discretion blindly and without knowledge of the facts. That must be true in cases in which the defendant pleads guilty as much so as in those cases in which he pleads not guilty, and that, too, notwithstanding the foregoing rule that the jury should be left untrammeled by any instruction of the court in exercising their discretion. * * * They have a broad discretion, it is true, but one which the lawmaking power intended should be wisely and prudently exercised, in the light of the evidence. Surely, it was never contemplated that they might, without regard to the facts and circumstances of the case, arbitrarily and without reason, act upon the question of punishment." *State v. Brown,* 60 *Wyo.* 379, 151 *P.* 2d 950 (1944).

Under the statute of that state defining first degree murder and fixing the penalty, as has been indicated above, the court, as a matter of practice, may accept a plea of guilty of murder in the first degree and then impanel a jury in order to have the punishment determined. It must be recognized that in many murder cases the defendant admits his guilt and the only question open is the matter of punishment. The procedure adopted by the Wyoming courts—and a number of other jurisdictions—obviously permits expeditious disposition of homicide cases. It circumvents long trials and avoids the large expenditure of public moneys usually required in order to prove the guilt that the accused readily concedes. In New Jersey, if the trial court accepts a plea of *non vult* to first degree murder, the death penalty cannot be inflicted. But if such a plea is refused, usually because the prosecutor feels that the death penalty is warranted and therefore recommends against its acceptance, a not guilty plea is entered and the case proceeds to trial. At such a trial the State is required formally to prove guilt with all the solemnity that ordinarily attends an actual contest on the subject, although the accused sits in court awaiting the opportunity to admit his crime, and although every one concerned knows that the only problem is that of punishment. However, our practice stems from the statutory mandate and any change must come from the Legislature. *N. J. S.* 2A:113–3. The act barring the plea of guilty was adopted in 1898. *L.* 1898, *c.* 235, *p.* 824. The more modern *modus operandi* of other states may justifiably attract attention in New Jersey.

The pertinent enactment of Pennsylvania provides:

"Whoever is convicted of the crime of murder in the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict. * * * In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life." 18 *P. S.* § 4701.

In construing this statute, the Supreme Court of that state said:

"It is, of course, true that the jury is entitled to be informed of all the circumstances and conditions properly to be regarded as relevant to the determination of the penalty; therefore it has been held that testimony concerning the mental incapacity of a defendant charged with murder, even though short of insanity, is admissible for that purpose." *Commonwealth v. Wooding*, 355 *Pa.* 555, 50 *A. 2d* 328 (1947).

Evidence of mental weakness or deficiency must be taken into consideration in determining and fixing the penalty, whether the arbiter is the court on a plea of guilty or the jury. *Commonwealth v. Thompson*, 389 *Pa.* 382, 133 *A. 2d* 207 (*Sup. Ct.* 1957), *certiorari* denied 355 *U. S.* 849, 78 *S. Ct.* 77, 2 *L. Ed. 2d* 59 (1957); *Commonwealth v. Elliott*, 371 *Pa.* 70, 89 *A. 2d* 782 (*Sup. Ct.* 1952); *Commonwealth v. Zietz*, 364 *Pa.* 294, 72 *A. 2d* 282 (*Sup. Ct.* 1950); *Commonwealth v. Irelan*, 341 *Pa.* 43, 17 *A. 2d* 897 (*Sup. Ct.* 1941); *Commonwealth v. Hawk*, 328 *Pa.* 417, 196 *A.* 5 (*Sup. Ct.* 1938); *Commonwealth v. Stabinsky*, 313 *Pa.* 231, 169 *A.* 439 (*Sup. Ct.* 1933). In *Commonwealth v. Simmons*, 361 *Pa.* 391, 65 *A. 2d* 353 (*Sup. Ct.* 1949), *certiorari* denied 338 *U. S.* 862, 70 *S. Ct.* 96, 94 *L. Ed.* 528 (1949), it was declared that the jury "should be able intelligently to fix the penalty, and, to that end, they ought to know what manner of man it is upon whom they are being asked to impose sentence,—his criminal proclivities, his demonstrated attitude toward law and order, and, on the other hand, such mitigating factors as may exist in the nature of impaired health, mental deficiencies, state of intoxication or other circumstances." And in *Commonwealth v. Bibalo*, 375 *Pa.* 257, 100 *A. 2d* 45 (1953), the Supreme Court found the following instruction to the jury to be "unimpeachable":

"If you find this defendant guilty of murder in the first degree, you may consider the proof in insanity, which, even though it may not substantiate the charge of insanity, it may be sufficient to convince you that there are circumstances which would justify you in not administering the death penalty."

The Supreme Court of Illinois, in discussing the statute which empowers the jury to fix the punishment in a murder case, said:

"It necessarily follows that, in order to determine the degree of punishment to be imposed for this offense [as between death, life imprisonment or for a term not less than 14 years], evidence must be admissible which would not have been admissible, or, if admitted, could have availed nothing, at common law." *Fletcher v. People*, 117 *Ill.* 184, 7 *N. E.* 80, 82 (1886). (Insertion mine.)

An Idaho law permits the court in homicide cases to hear "circumstances" either in mitigation or aggravation of the punishment after conviction. The interpretation thereof by the Supreme Court in *State v. Owen*, 73 *Idaho* 394, 253 *P. 2d* 203 (1953), is of interest:

"* * * It may be open to debate as to whether the 'circumstances' mentioned in § 19–2515, *I. C.*, refer particularly to circumstances surrounding the commission of the crime and tending to aggravate or mitigate the character of the conduct involved, or whether such circumstances include also the convict, himself, as an individual, which would include his background, his age, upbringing and environment or any other matter appropriate to a determination of the degree of culpability. We think that the statute should be given the broader interpretation, particularly in a capital case. *James v. State*, 53 *Ariz.* 42, 84 *P. 2d* 1081.

It, therefore, appears that the law contemplates that in fixing the penalty, the court, when requested by either party, may and should hear and consider circumstances in aggravation or mitigation of the punishment. It logically follows that if it is proper for the court to hear and consider such evidence, the jury where it is called upon to fix the punishment, should have the opportunity to consider such proof, subject, of course, to a proper instruction limiting the jury's consideration of such evidence to the determination of punishment, and cautioning that it is not to be considered in determining guilt or innocence, or be allowed to influence the determination of that question."

Similar expressions may be found in Colorado: *Abshier v. People*, 87 *Colo.* 507, 289 *P.* 1081 (*Sup. Ct.* 1930); Indiana: *Sherer v. State*, 188 *Ind.* 14, 121 *N. E.* 369 (*Sup. Ct.* 1919); Oklahoma: *Prather v. State*, 14 *Okl. Cr.* 327, 170 *P.* 1176 (*Crim. Ct. App.* 1918); Kentucky: *Howell v. Commonwealth*, 313 *Ky.* 662, 233 *S. W. 2d* 270 (*Ct. App.* 1950); cf. *Miller v. Commonwealth*, 200 *Ky.* 435, 255 *S. W.*

96 (*Ct. App.* 1923); and see, *Weihofen, Mental Disorder as a Criminal Defense* (1954), *p.* 209.

Under all of the circumstances, I have no doubt that the proper construction of our statute is that evidence of a defendant's mental deficiencies should be admitted in murder cases as a factor attending the commission of the offense, for evaluation by the jury in connection with its deliberations on the issue of punishment.

WACHENFELD, J. (dissenting). I have no aversion to changing a law when it has become outmoded or contrary to our fundamental concept of justice.

Here the defendant was guilty, without question and by his own admission, of one of the most brutal murders ever recorded. His victim, a small, weak, old man, was unmercifully beaten to death by a horrible onslaught with the butt end of a gun. He was battered into eternity with a savage brutality and frenzied viciousness difficult of description.

The excuse for the heinous crime was simple. The murderer wanted money to buy narcotics. For him we have changed the law as it has stood on our books for many years, and I wonder why.

When changing society in altered times indicates a law has become useless or too restricted or too broad, I have added my voice to a change so that the quality of justice might be preserved, but to change the law to further protect the worst of our criminal element, to increase their privilege and their right to prey upon others with immunity, is not my concept of how justice should be improved.

Our laws and our Constitution were meant for the good as well as the bad, but all interpretations of late seem to constantly benefit the criminal element and thus continue to diminish the protection the responsible citizens were to receive. Fundamental fairness is a commodity the public should occasionally have the privilege of enjoying.

The law has two essential objects: the protection of society and the preservation of individual rights. Lately

society seems almost forgotten in what the judiciary seems to think is a march of progress. Instinctively my conscience blocks my agreement.

Many critics have appeared of late condemning the courts because the major trend has evinced considerable emphasis on the increased protection of the accused and on establishing additional procedural requirements which must be met before convictions can be obtained. Public criticism, of course, should not control, but it is abundant enough and of a sufficiently intelligent quality to suggest to the judiciary at least a pause for reflection. When a judicial system destroys public confidence, in effect it destroys itself. Justice is a cornerstone which must never be out of balance.

The Director of the FBI has issued public statements showing the terrific increase of crime and asking for greater aid from the courts so that some inroads may be made.

At the Judicial Conference, Governor Meyner urged the courts to cooperate in attacking the "alarming upsurge of crimes of violence" and asked for a "firm and realistic attitude in dealing with convicted offenders in cases of personal violence."

The sentencing judges are attempting to assist by stiffening the penalties at the trial level, while we at the top open more loopholes, making successful prosecution more difficult; this time for the gentleman who cold-bloodedly murdered so he could get money to buy narcotics. His victim has been buried, but he wants more than a fair trial on the law as it has already been determined. He wants the law changed so that he can derive greater consideration than those who preceded him.

The right of the court to inform the jury, in the manner employed in the instant case, that a life sentence is, in fact, a misnomer and that the Parole Board or another agency might considerably shorten the term has stood with unequivocal approval on our books for well nigh 50 years. It has been affirmed by dozens of decisions and was reaffirmed by an unanimous court in an opinion written by Chief Justice Vanderbilt as late as November 1954, in which he said of

almost the identical language used by the trial court in this case: "Such instruction was proper." *State v. Roscus,* 16 *N. J.* 415, 429.

To say the court has been wrong over these many years and that that which has become deeply imbedded in our criminal law should now be extirpated is quite a bold venture in which I cannot join.

The majority opinion reverses the conviction because the charge to the jury was too limited on the power of the Parole Board to shorten the so-called life sentence. It then inconsistently holds that the court should have directed the jury "to exclude the subject from consideration." Why there was reversible error for failure to completely inform the jury in view of the majority's subsequent determination that the jury could not take the matter into consideration is beyond my understanding.

Those in authority know that a life sentence in the average case is actually a term of approximately 14 to 15 years, and why the jury, which pronounces the punishment, should not be so informed and take it into consideration is beyond my comprehension. Life imprisonment is a false designation and the jury is entitled to know its true meaning. The public is already painfully aware of it.

I would affirm the judgment of conviction below.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, JACOBS, FRANCIS and PROCTOR—5.

*For affirmance*—Justices WACHENFELD and BURLING—2.